

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-25-1994

# United States v. Himelwright

Precedential or Non-Precedential:

Docket 94-7206

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"United States v. Himelwright" (1994). *1994 Decisions.* Paper 200.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/200

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 94-7206

———————

UNITED STATES OF AMERICA

vs.

RICHARD C. HIMELWRIGHT

Appellant.

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

(D.C. Criminal No. 93-cr-00222)

———————

ARGUED SEPTEMBER 12, 1994

BEFORE:  STAPLETON, ALITO and LEWIS, Circuit Judges.

(Filed November 25, 1994)
———————

GREGORY L. LENSBOWER (ARGUED)
Stonesifer & Kelley
209 Broadway
Hanover, PA  17331

        Attorney for Appellant


KIM D. DANIEL (ARGUED)
Office of the United States Attorney
Federal Building
228 Walnut Street
P.O. Box 11754
Harrisburg, PA  17108

Attorney for Appellee

_____

OPINION OF THE COURT

_____


LEWIS, Circuit Judge.

Richard Himelwright was indicted on September 7, 1993, and charged with two counts of Interstate Threats and Extortionate Demands, in violation of 18 U.S.C. § 875(b),[1] (Counts I and II), and one count of Interstate Threats, in violation of 18 U.S.C. § 875(c),[2] (Count III).  Prior to trial, Himelwright filed a motion in limine seeking to bar testimony regarding his purchase and possession of two firearms, claiming that their admission would violate Rule 404(b) of the Federal Rules of Evidence and would be unduly prejudicial under Rule 403. By Memorandum Opinion dated November 12, 1993, the district court

---

[1].  18 U.S.C. § 875(b) provides:

> Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.

[2].  18 U.S.C. § 875(c) provides:

> Whoever transmits in interstate commerce and communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined not more than $1,000 or imprisoned for more than five years, or both.

denied the motion, finding that the firearms evidence was admissible under Rule 404(b) as proof of Himelwright's intent to commit the crimes charged or, in the alternative, as indicative of his plan or preparation. Memorandum Opinion at 5. Himelwright was subsequently convicted and sentenced to 18 months imprisonment,[3] to be followed by three years supervised release. Himelwright appeals.

## I.

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Because we believe that the district court erred in admitting testimony concerning Himelwright's purchase and possession of firearms, as well as the firearms themselves, we will reverse the district court's denial of the in limine motion and vacate Himelwright's conviction.

## II.

Prior to his arrest on September 8, 1993, Himelwright had been employed as a truck driver with the United States Post Office in York, Pennsylvania. Several months before the events which lead to his arrest occurred, Himelwright had been found guilty of driving under the influence of alcohol, a conviction which, because of the mandatory one-year suspension of driving privileges, jeopardized his continued employment as a truck

---

[3]. The 18 month sentence was imposed after the district court downwardly departed from the 37-46 month guideline range. The downward departure was based on the fact that Himelwright "made threatening phone calls to an answering machine, not an actual person, and the answering machine was for a[] . . . hotline designed to assist employees." United States v. Himelwright, No. 93-222-01 (M.D. Pa. March 30, 1994)(order of judgment).

driver.  In anticipation of having his license suspended, Himelwright applied for several non-driving jobs with the Postal Service.  Because he had two daughters who lived with their mother in Moorhead City, North Carolina, Himelwright focussed his efforts on openings in the Mid-Carolina's District.

One of the positions Himelwright sought was in Florence, South Carolina.[4]  The Florence postal facility had a maintenance position which would be held open until July 1, 1993.  In order to qualify for the position, Himelwright was required to take and pass an aptitude test.  In early June, Himelwright was advised that the test was only conducted twice a year, in February and August.  He contacted the Postal Service's Employee Assistance Program (EAP) Hotline, and requested help in obtaining an earlier test date.  A test was scheduled for July 9, 1993, at the post office in Lancaster, Pennsylvania.  Either because he was approximately two hours late, or because the Postal Service did not accurately inform him of the time for the test, Himelwright was not able to take the test on July 9.  The test was then rescheduled for July 12, 1993, and Himelwright completed the exam that day.  When he was finally notified on July 24 that he had passed the test, however, the Florence position apparently was no longer an option.

Almost one week later, on the evening of August 30, 1993, Himelwright placed several telephone calls to two Postal

_____

[4].  Himelwright also applied for custodial position in Raleigh, North Carolina, where his transfer reassignment form was received on August 30, 1993.

Service hotlines in Washington, D.C., from his home in York.  He

had been drinking and was fearful that a hurricane was going to

hit the town where his two daughters lived.  The first call,

placed at approximately 8:20 p.m., was to the EAP Hotline.

Because it was received after business hours, his call was

answered by an answering machine.  Himelwright made the following

statement:

> Hello, my name is Richard C. Himelwright, 866
> Tioga Street, York, PA.  Case No. 1610.  I
> requested y'all to give me a letter from
> Lancaster where they stated they were going
> to give me the test by July 1st.  Y'all won't
> respond to that.  That's fine and dandy.  Now
> this is August 30th, 8:20 p.m., the hurricane
> is gonna hit in the next four hours, where my
> daughters live in Moorhead City, North
> Carolina, and y'all ain't doing shit about
> getting my transfer.  Now I'm very, very,
> irate here, this ain't a threat, but I shot
> on too many rifle teams, and I'm tired of
> being jerked around.  Now you all ain't
> giving me no help at all, none whatsoever.
> You won't return no phone call all of a
> sudden, nobody's doing nothing.  You told me
> that Lancaster said, "Oh yeah, you gonna have
> the test by July 1st."  Wrong.  I didn't get
> it until July 9th and then it was postponed
> 'til July 12th.  Oh, that's not your fault,
> that's my fault, right?  Wrong.  I lost that
> transfer to Florence.  Now I'm trying for
> Raleigh, North Carolina.  Now I'm tellin'
> y'all right now, if I don't get that
> transfer, there's gonna be some shit!  Cause
> I'm tired of playing games with y'all.  I'm
> tired of playin', I don't even know if my
> daughters is gonna make it through the night.
> I can't even get through.  The lines are
> dead.  I don't even know where my daughters
> are right now.  They live in Moorhead City,
> North Carolina, where the storm is supposed
> to hit between now and midnight, and y'all
> ain't done shit for me.  You got me so (sob)
> freakin' upset.  Oh, never mind, you ain't no
> help.

Himelwright then called the Postal Inspection Service Crimes Hotline and left a message for a duty officer to return his call.  At about 8:30 p.m., Postal Service Police Officer Roberto S. Lloyd contacted Himelwright, who explained his predicament and, in the process, stated:

> I am irate and upset because I'm getting shafted.  Someone better do something now because I'm getting tired of it now. . . .  I want to be with my daughters but the Postal Service is saying, "Fuck You!" . . .  If something happens to these children, someone is going down the tubes. . . .  I was a policeman in North Carolina and a weapons specialist in the Marine Corps.  Why is everybody messing with me?  They worry about shootings in the Post Office, they should worry about me if anything happens to my children because of the hurricane.  Shit will hit the fan; this is not a threat but a promise.

About one-half hour later, Himelwright called the EAP Hotline again and left another lengthy message.  He once again made threatening remarks and expressed his frustration about the Florence position as well as his concern that his children might be in danger.  He then called his friend and Local Union President, Henry P. Dennis, Jr.  Himelwright told Dennis:

> Henry, I really blew it this time.  I really blew it big time.  My job's down the tubes.  I just called the Postal Inspectors and spilled my guts.  I told them everything from Bill Runkel to them screwing around with my transfer to North Carolina.  I feel like coming in there and blowing everybody away.  You don't have to worry, I don't want you.

Dennis called the York Post Office receptionist and warned her that if Himelwright were to appear at the Post Office, she should call 911.

The next day, a group of Postal Inspectors gathered at the York Post Office. They contacted Himelwright and asked him to come into the Post Office to be questioned. Himelwright refused. Later that day, the inspectors went to his home accompanied by a uniformed police officer. After he executed a written waiver of his Miranda rights, the inspectors asked Himelwright whether he owned any firearms. He produced two weapons -- a .38 caliber Smith and Wesson revolver and a Thompson-Center Contender pistol. The inspectors confiscated the weapons and asked Himelwright if he had placed any calls to the EAP and Crimes hotlines the night before. Himelwright admitted placing the calls, but denied making any threats. He also told the inspectors that he had made the calls after consuming alcohol and taking the drug diazepam. His arrest and indictment on the charges mentioned above followed.

### III.

When deciding whether to admit "other acts" evidence under Rule 404(b), a trial court initially must consider two issues: first, whether the evidence is logically relevant, under Rules 404(b) and Rule 402, to any issue other than the defendant's propensity to commit the crime; and second, whether under Rule 403 the probative value of the evidence outweighs its prejudicial effect. United States v. Sampson, 980 F.2d 883, 886 (3d Cir. 1992). The trial court has significant leeway in making

both determinations.  Id. at 886.  We, therefore, would
ordinarily review the district court's evidentiary rulings for an
abuse of discretion.  Id.  Where, however, the district court
fails to explain its grounds for denying a Rule 403 objection and
its reasons for doing so are not otherwise apparent from the
record, there is no way to review its discretion.  Id. at 889
(citing Government of the Virgin Islands v. Pinney, 967 F.2d 912,
918 (3d Cir. 1992)).  In such cases, we need not defer to the
reasoning of the district court, and we may undertake to examine
the record and perform the required balancing ourselves.
Government of the Virgin Islands v. Archibald, 987 F.2d 180, 186
(3d Cir. 1993).

> Federal Rule of Evidence 404(b) provides:
> Evidence of other crimes, wrongs or acts is
> not admissible to prove the character of a
> person in order to show that he acted in
> conformity therewith.  It may, however, be
> admissible for other purposes, such as proof
> of motive, opportunity, intent, preparation,
> plan, knowledge, identity or absence of
> mistake or accident.

Despite our characterization of Rule 404(b) as a rule
of admissibility, United States v. Scarfo, 850 F.2d 1015, 1019
(3d Cir. 1988), we have expressed our concern that, although the
proponents of Rule 404(b) evidence "will hardly admit it, the
reasons proffered to admit prior act evidence may often be
potemkin village, because the motive, we suspect, is often mixed
between an urge to show some other consequential fact as well as
to impugn the defendant's character."  United States v. Jemal, 26
F.3d 1267, 1272 (3d Cir. 1994) (quoting Sampson, 980 F.2d at

886).  Thus, when evidence of prior bad acts is offered, the proponent must clearly articulate how that evidence fits into a chain of logical inferences, no link of which can be the inference that the defendant has the propensity to commit the crime charged.  <u>Jemal</u>, 26 F.3d at 1272.  But even where the proffered evidence tends to prove some fact besides character, admissibility depends upon whether its probative value outweighs its prejudicial effect.[5]  As a result, once the proponent articulates a permissible purpose under Rule 404(b), the district court must weigh the probative value of the evidence against its potential to cause undue prejudice.  <u>Id</u>. at 1272.

With these familiar principles of admissibility and review in mind, we turn our attention to the district court's denial of Himelwright's motion <u>in</u> <u>limine</u> and the introduction of Himelwright's possession and purchase of the firearms in question.

IV.

The district court found that Himelwright's purchase and possession of firearms clearly constituted "other acts," whose admissibility is governed by Rule 404(b). <u>Memorandum Opinion</u> at 3.  The government offered two theories of

---

[5].  Fed.R.Evid. 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

admissibility:  first, to rebut any claim by Himelwright that he lacked the requisite mens rea; and second, to show that Himelwright not only planned to carry out his threats, but that he was prepared to do so.  We will address these two theories in turn.

## A.

In order to admit evidence under the "intent" component of Rule 404(b), intent must be an element of the crime charged and the evidence offered must cast light upon the defendant's intent to commit the crime.  United States v. Kirk, 528 F.2d 1057, 1060 (5th Cir. 1976).

## 1.

In Count III of the indictment, Himelwright was charged with transmitting a wire communication with the intent to injure another, in violation of 18 U.S.C. § 875(c).  The district court correctly determined that to establish a violation of this section, the government bore only the burden of proving that Himelwright acted knowingly and willfully when he placed the threatening telephone calls and that those calls were reasonably perceived as threatening bodily injury.  The government bore no burden of proving that Himelwright intended his calls to be threatening or that he had an ability at the time to carry out the threats.  United States v. Cox, 957 F.2d 264, 266 (6th Cir. 1992); United States v. DeAndino, 958 F.2d 146, 148-49 (6th Cir. 1992); Cf. United States v. Orozco-Santillan, 903 F.2d 1262, 1265 n.3 (9th Cir. 1990) (applying 18 U.S.C. § 115, governing threats made to federal law enforcement officer).  Himelwright's

possession of the two firearms the morning after placing the calls, the government argued, could permissibly lead the jury not only to conclude that he possessed the guns at the time he placed the calls, but that his possession was evidence of his knowledge and willfulness.

On its face, this might appear to be a plausible basis for admissibility under Rule 404(b), at least to the extent that the government attempted to connect one of the exceptions delineated in the Rule (intent) to an element of the offense with which Himelwright was charged. To appreciate the error in this position, however, and in the district court's acceptance of it, one must look deeper, for the problem with the government's argument lies in the unavoidable distinction between the general intent to make a threat to injure another, on the one hand, and a subjective intention to carry out the threats, on the other. We believe the government's true aim in offering the firearms evidence was to prove the latter. Significantly, section 875(c) requires proof of a defendant's general intent to threaten injury, but does <u>not</u> require proof of a specific intent to injure another or the present ability to carry out the threat. <u>United States v. Holder</u>, 302 F. Supp. 296, 300 (D. Montana 1969), <u>aff'd by</u>, 427 F.2d 715 (9th Cir. 1970). <u>Cf</u>. <u>United States v. Cooper</u>, 523 F.2d 8, 10 (6th Cir. 1975) (applying 18 U.S.C. § 875(b)). The government, however, offered no evidence showing a connection between Himelwright's possession of the firearms and his "intent" to place the telephone calls and say the things he did. Moreover, we cannot agree that Himelwright's possession of the

firearms constituted evidence of his intent because the government did not need to establish that Himelwright had the specific intent to injure or the present ability to carry out the threats in order to establish a violation of section 875(c). Himelwright's intention to accomplish these things, which the government sought to establish through his possession of the firearms, simply was not an element of the crime charged and did not cast light upon his intention to commit the crime charged.

At best, the fact that Himelwright was found in possession of the firearms the day after he placed the calls is indicative of his capability to carry out the threats. Evidence of capability, however, is not only unnecessary to satisfy the elements of section 875(c); it is likewise not included among the categories of admissibility to which Rule 404(b) is addressed. Although evidence can be admitted even if it does not fit one of the specific exceptions listed in the Rule, character evidence which is offered to prove the likelihood that the defendant committed the particular crime is nevertheless inadmissible. Jemal, 26 F.3d at 1272 (citing Scarfo, 850 F.2d at 1019). Here, the government sought to convince the jury that Himelwright's capability to carry out the threats or to injure, demonstrated through his possession of the firearms, made it more likely that he intended to do so. Thus, while the government's argument was cloaked in terms of Himelwright's intent, the goal here was actually something different; it was to portray Himelwright as a person who possessed the wherewithal to do what he said he would do in order to demonstrate that it was more than likely that he

intended the threats and had, therefore, committed the crime charged.

Accordingly, we conclude that the forbidden purpose which lay barely beneath the surface of the government's argument -- the likelihood that Himelwright committed the offense based on an inference of his intent drawn from evidence pertaining to his character (his possession of two firearms) -- renders the evidence inadmissible under Rule 404(b). Id. See also Archibald, 987 F.2d at 185; cf. Huddleston v. United States, 485 U.S. 681, 691 (1988). In so concluding, we emphasize the important distinction between the use of character evidence to show Himelwright's intention to make the threatening calls, as charged under section 875(c), which might have been permissible under Rule 404(b) had the government connected it to his possession of the firearms, and the use of such evidence to show that he had the capability to act upon the threats. The latter may easily be seen as a disguised attempt to accomplish precisely what is disallowed, namely, to show that "more than likely" the defendant intended to do that with which he or she stands charged.

2.

We reach a different conclusion -- applying a somewhat different rationale -- with respect to Counts I and II (the 18 U.S.C. § 875(b) counts). Under § 875(b), the government was not only required to prove that Himelwright knowingly and willfully made the calls, but that he acted with the specific intent to extort a thing of value from the Postal Service. The government

argued that evidence of Himelwright's possession of the two handguns entitled the jury to conclude that he acted with the specific intent to extort a job transfer when he communicated the threats.

We agree that a plausible argument could be made that the fact that Himelwright was capable of carrying out the threats might be relevant to his intent to extort a job transfer; that is, we do not discount the contention that one's capacity to do violence to another could bear some relevance to one's intent in conveying an extortionate threat. Conceivably, despite the fact that the recipients of the calls were hundreds of miles away, the jury could have (1) inferred from the presence of the two handguns in his house that Himelwright was more likely to have had the capacity to carry out a threat of violence than if he had no handguns in his house,[6] (2) inferred from the fact that he _may_ have had the capacity to carry out a threat of violence that Himelwright was more likely to have wished to make a threat of violence than if he had no such capacity, and (3) inferred from the fact that he _may_ have had a wish to make a threat of violence that Himelwright was more likely to have understood his communication to be a threat of violence.

---

[6]. The jury may have regarded this link in the chain of logic as being foreclosed by the judge's instructions. While he told the jury that it could consider whether the presence of the handguns was "probative as to whether defendant intended to make threats," he also instructed that the presence of the handguns "may not be used to conclude that the defendant had the ability to carry out his alleged threat." We have been unable to perceive any chain of logic from the presence of the handguns to the required intent that does not involve this apparently prohibited link.

But even assuming arguendo that Himelwright's gun possession is marginally relevant to the specific intent to extort, we nevertheless find that the probative value of the firearms evidence was substantially outweighed by the resulting prejudice to Himelwright. In Part V, below, we set forth a full and detailed analysis with respect to the Rule 403 violation, as well as our views concerning the district court's failure to conduct the requisite balancing of interests under the Rule. For present purposes, however, because we conclude that the evidence should have been excluded by Rule 403, we will assume, without deciding, that Himelwright's possession of the firearms was relevant to his intent to extort and, therefore, admissible under Rule 404(b).

## B.

In addition to arguing that the firearms evidence was admissible as proof of intent, the government contended that the firearms evidence was admissible under the "plan" and "preparation" exceptions to Rule 404(b). It argued that Himelwright's purchase of the Smith and Wesson revolver on or about June 20, 1993, less than one week after he made the first call to the EAP Hotline to inquire about getting an earlier test date, tended to establish a pre-conceived plan to threaten violence in the event that the Postal Service did not meet his transfer demands. But this argument fails to acknowledge that at the time Himelwright initiated the purchase of the revolver, he had no way of knowing that he would experience difficulty in securing a transfer. This is a significant missing "link" in the

chain of logical inferences which the government must clearly
articulate as the very foundation for admissibility of prior bad
act evidence, rendering the links which remain inherently and
inevitably flawed.  To carry the metaphor further, it is
important to note again that no link in the chain may contain an
inference that because the defendant committed the prior act, it
is, therefore, more likely that he or she committed this one,
too.  Jemal, 26 F.3d at 1272 (citing Sampson, 980 F.2d at 887).
But that is precisely what we are left with here, for as we
discuss below, we can find no demonstrable link -- not even a
remote one -- between, on the one hand, the purchase of the
revolver in June (at a time when Himelwright was just beginning
to pursue a transfer), and his "planning" or "preparing" to carry
out threats of violence because he was, over a month later,
unsuccessful in obtaining the transfer.

　　　　We believe the relevant time frame with respect to a
plan or preparation is the time between the purchase of the
revolver on or about June 20, 1993, and the August 30 telephone
calls.[7]  The government did not present any evidence of

---

[7].　See United States v. Philibert, 947 F.2d 1467 (11th Cir.
1991).  In reviewing a district court's admission of evidence
concerning Philibert's purchases of weapons and ammunition two
months prior to making threatening telephone calls to his
supervisor, the Eleventh Circuit stated:

> . . . we fail to perceive, any possible relevance,
> on the question of whether appellant did or did
> not place a threatening phone call . . . on
> August 11, 1989, of the fact that two months
> earlier he had purchased certain firearms.

Philibert, 947 F.2d at 1470.

Himelwright's actions during this time period which could be construed as part of a plan or scheme to threaten anyone, let alone to extort a transfer from the Postal Service.  Nor did the government offer any evidence connecting the purchase of the weapon in June to the threats Himelwright issued at the end of August.  Indeed, a fair reading of the transcripts suggests that the impetus for the calls was a hurricane which Himelwright perceived as a threat to the safety of his children in North Carolina, and his perception that by failing to transfer him, the Postal Service was responsible for his inability to respond to an imminent danger to his children.  While we in no way mean to imply that this constituted any justification for Himelwright's actions, that is the thrust of his profanity-laced, threatening diatribes.  The transcripts may also fairly be read to evince an intent on the part of Himelwright to retaliate through the use of firearms.  The meaning to be ascribed to the transcripts, however, in light of the other evidence in this case, is for a jury to determine if this case is to be retried.  But the point here is that there is no evidence to suggest that the threats flowed from a plan Himelwright had concocted in June -- again, before he even knew whether he would be transferred -- when he purchased the revolver.  While such a conjectural leap might support the government's theory, the two events are far too attenuated and devoid of evidence of any connection to one another to fall within the ambit of Rule 404(b).

(..continued)

V.

Even if we were to accept that the government's proffered purposes were somehow proper under Rule 404(b), our inquiry would not end there because the trial court failed to determine and to articulate whether the probative value of the firearms evidence outweighed its prejudicial effect under Rule 403. Sampson, 980 F.2d at 889 (citing United States v. Echeverri, 854 F.2d 638, 644 (3d Cir. 1988)). Once again, when a court engages in a Rule 403 balancing and articulates on the record a rational explanation for its determination, we will rarely disturb its ruling. Id. at 889 (citing Government of Virgin Islands v. Harris, 938 F.2d 401, 420 (3d Cir. 1991)). Where, as here, the court fails to perform this analysis, the measure of deference we might otherwise accord is lessened, and we may undertake to examine the record ourselves and conduct the appropriate weighing test. Archibald, 987 F.2d at 186.

Our review of the record compels us to conclude that even if the firearms evidence had been admissible under Rule 404(b), a proper balancing of its probative value against its prejudicial effect under Rule 403 would have rendered it inadmissible in any event.

Initially, it is impossible to overlook the powerful impact of this type of evidence on the questions whether the telephone calls were, indeed, sufficiently threatening to satisfy the elements of section 875(c) beyond a reasonable doubt, and whether Himelwright made them with the intent to extort a job transfer from the Postal Service, in violation of section 875(b).

The words Himelwright uttered to the answering machines; the statements he made to Dennis; the statements he made to Officer Lloyd; the statements he made to the Postal Inspectors; and the circumstances surrounding his failed attempt to secure a transfer all speak for themselves. Without question, a rational chain of inferences could be drawn from these evidentiary links, each of which bore some logical relevance to the criminal charges Himelwright faced. But to compound that evidence by asking the jury to draw inferences as to Himelwright's intent from his purchase and possession of the two firearms was, we think, to invite a degree of prejudice which outweighed the probative value of that evidence under a proper balancing pursuant to Rule 403.

The government dwelled upon the guns at great length when presenting its evidence and making its closing argument. At trial, the man who sold Himelwright the revolver on June 22 was called by the government to testify about the transaction. He indicated that Himelwright was "very nervous" and that his hand was "shaking" when he bought the gun. Appellant's App. 64a. The government also tendered testimony from the man who helped complete the paperwork associated with the sale of the revolver. He testified that Himelwright did not take possession of the revolver until approximately July 1, when all background checks had been completed. Then, the government called one of the postal inspectors who visited Himelwright the day after the telephone calls and solicited testimony that the two handguns were in Himelwright's home at the time of his visit. The government concluded its closing argument to the jury with the

following comments, which contained all of its argument

concerning the handguns:

> We know, ladies and gentlemen, that less than a week [after telephoning the EAP Hotline for assistance in arranging a custodial worker's examination], Mr. Himelwright bought a gun. He bought a .38 caliber revolver. He bought it from William Kiehl.

> Mr. Kiehl testified and the firearms dealer that was involved in the transfer, Greg Flinchbaugh, testified. They told about how Mr. Himelwright inspected the gun and bought it that night for $120.00 cash. He told you how the paperwork was filled out so that Mr. Himelwright could get legal ownership of that gun. But for some reason, Mr. Himelwright never personally appeared before Mr. Flinchbaugh.

> The question has been raised why a .38 caliber revolver? Several explanations have been offered. One, Mr. Himelwright wanted to use it for target practice. Two, he was a gun collector. Three, he wanted to give the gun as a gift to Bonnie, his girlfriend.

> But you heard the testimony. Is a short barrel, a two and a half inch barrel .38 caliber revolver a gun that is normally used for target shooting? No, it is too inaccurate. It is not a gun used by target shooters.

> A gun collector? Mr. Himelwright wasn't a gun collector. He had two guns, but he wasn't a gun collector.

> And giving it as a gift to Bonnie Irvin [his girlfriend]? You heard her testimony. Bonnie Irvin never shot that gun. In fact, she told you she never even held it.

> Why a .38 caliber? We know Mr. Himelwright was a police officer for six years in North Carolina. Thirty-eight caliber revolvers are handguns that are

> normally used by police departments.  As Mr.
> Himelwright repeatedly told you, he was a
> weapons specialist.  He was a cop.  He knew
> about guns.  He knew how to handle them.  He
> went out and bought a .38 caliber revolver.
> That gun wasn't for anybody else except for
> Richard Himelwright's use.

Appellant's App. 99a-100a.

The object, or at least effect, of this disproportionate emphasis by the prosecution, we believe, was to portray Himelwright as a violence-prone postal worker who was a danger to society and who needed to be removed for the protection of the public.[8]

Moreover, the manner in which this evidence was used at trial exacerbated the error of its admission:  the prosecutor was permitted to introduce into evidence, and display before the

_____

[8].   Himelwright's two-day trial took place on November 15 and 16, 1993, following a series of well publicized shooting sprees by postal workers.  See, e.g., Workers Kill Workers; Yet Again, Violence in the Post Office, New York Times, May 9, 1993, Sec. 4, at 2; Inside Post Offices, the Mail is Only Part of the Pressure, New York Times, May 15, 1993, at A1; Postal Study Aims to Spot Violence-Prone Workers, New York Times, July 1, 1993, at A9.  As reported in the New York Times on August 3, 1993, "There have been at least 11 shooting incidents involving aggrieved emotionally disturbed postal workers in the United States in the last decade with 35 people killed and 18 wounded."  Police Arrest Postal Worker in Pistol Threat to His Wife, New York Times, Aug. 3, 1993, at B5.

We believe the government's portrait of Himelwright as the stereotypical violence-prone postal worker had serious potential for prejudice to him in two different ways.  First, it had the potential for frightening the jury into ignoring evidence that otherwise might have raised a reasonable doubt about whether he intended a serious threat.  Second, if the jury was persuaded that Himelwright was violence-prone by character, it might have inferred that he intended violence in this particular instance.  That inference is precisely what Rule 404(b) prohibits.

jury, the firearms themselves. Such a method of introduction is not proscribed. But because of the remote connection between the possession (or purchase) of the firearms and telephone calls, the display of weaponry was far more prejudicial than probative under the circumstances of this case. We believe that this enabled, if not invited, the jury to draw impermissible inferences which might well have deprived Himelwright of a fair trial.[9]

## VI.

For the reasons set forth above, we conclude that evidence of Himelwright's purchase and possession of firearms should not have been admitted under Rule 404(b) as evidence of a

---

[9]. We note that the district court gave the following precautionary instruction:

> Ladies and gentlemen, the mere fact that the defendant had purchased or possessed firearms may not be used to conclude that the defendant had the ability to carry out his alleged threat. You will recall I said that is not an element of the offense.
>
> Nor may you conclude from the fact of the purchase or possession that the recipient of the defendant's statements took them as threats. You may consider whether these facts are probative as to whether defendant intended to make threats.

Government's App. 45-46.

Although this instruction reflect's the district court's apparent understanding of the potential for undue prejudice to Himelwright, it does not cure the error in the first instance in not conducting the balancing of interests which Rule 403 requires, and which should have lead to the exclusion of Himelwright's possession and purchase of the firearms. United States v. Sampson, 980 F.2d 886, 889 (3d Cir. 1992) (Rule 403 requires the district court to evaluate evidence in the context of the developing case).

plan or preparation to commit the crimes charged, or of Himelwright's intent with respect to section 875(c). Assuming, as we do, that Himelwright's gun possession was marginally relevant to his intent to extort, we nevertheless conclude that the admission of the firearms evidence violated Rule 403. We further find that the district court erred by not performing the balancing analysis in response to the Rule 403 objection. Accordingly, we will reverse the district court's denial of Himelwright's motion in limine, vacate Himelwright's conviction and remand for further proceedings consistent with this opinion.