

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-21-2004

# USA v. Zavrel

Precedential or Non-Precedential: Precedential

Docket No. 03-1474

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"USA v. Zavrel" (2004). *2004 Decisions*. Paper 272.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/272

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES
COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 03-1474

———————

UNITED STATES OF AMERICA

v.

ROSEMARY ZAVREL,

Appellant

———————————————

On Appeal from the United States
District Court
for the Middle District of Pennsylvania

District Court Judge: The Honorable A.
Richard Caputo
(D.C. No. 01-cr-00356)

———————

Argued on January 26, 2004

Before: NYGAARD, FUENTES &
STAPLETON, Circuit Judges

(Opinion Filed: September 21, 2004 )

Patrick A. Casey [Argued]
Office of the Federal Public Defender,
Middle District of Pennsylvania
116 North Washington Avenue

Scranton, PA 18503

*Attorney for Appellant*

John C. Gurganus [Argued]
Office of the United States Attorney,
Middle District of Pennsylvania
235 North Washington Avenue
Scranton, PA 18501

*Attorney for Appellee*

———————————————

OPINION OF THE COURT

———————————————

FUENTES, Circuit Judge:

This case arises in the context of the anthrax scare of 2001. In October of that year, Rosemary Zavrel mailed seventeen envelopes containing a white powdery substance she intended to resemble anthrax to various local officials, school and hospital workers, and to the President of the United States. The envelopes actually contained cornstarch, and each listed a name and return address that belonged to either of two local juveniles. Zavrel and her roommate, Emily Forman, planned to frame the two boys whom Zavrel felt had unfairly accused Zavrel's son of making terroristic threats. The scheme went awry after a local resident discovered loose white powder when she opened the inside slot of a public mailbox. Police were called and the ensuing investigation led directly to Zavrel and Forman. Against

this backdrop, we consider the narrow question of whether the mailing of an envelope containing cornstarch meant to resemble anthrax, but containing no written message, constitutes a "communication . . . containing any threat . . . to injure the person of the addressee" under 18 U.S.C. § 876. For the reasons that follow, we hold that it does, and we therefore affirm the judgment of conviction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On the morning of October 23, 2001, Cindy Donlyn went to the Nanticoke, Pennsylvania Post Office to drop off some mail. When she opened the mailbox outside of the post office, she noticed some white powder on the chute inside the box and informed a postal worker. The Postmaster inspected the mailbox and quickly notified his superiors in Harrisburg and Washington, D.C., as well as the local police. The police unbolted the box from the ground and moved it to the back loading dock of the post office so that no customers could come near it. When the police opened the box they discovered several letters containing white powder. At this point, the Postmaster closed the entire post office. The Luzerne County Emergency Management Agency sent a team in protective suits to investigate further. The emergency personnel discovered the remaining letters, all containing a white powdery substance that was later determined to be cornstarch. The letters were seized and never delivered to the addressees.

During the course of the investigation, Nanticoke Police Detective William Schultz spoke with Dr. Mary Scott, Principal of the Nanticoke Middle School, who informed him that the juveniles whose addresses appeared on the letters had been students in 1999 at the Lincoln Elementary School where she had been principal. Schultz then discovered that in May 1999 he had been the investigating officer in an incident in which the two juveniles were the reported victims. The case was handled in juvenile court, and Zavrel's son, also a juvenile, was charged with making "terroristic" threats against the boys. Zavrel's son had apparently threatened to bring an automatic handgun to school and shoot the two juveniles as well as a third student. After a period of suspension from school, Zavrel's son was prosecuted, adjudicated delinquent and placed in juvenile detention. Schultz recalled that Zavrel contacted his department numerous times during the pendency of the case, urging that her son was innocent and that the other boys were lying.

A search of Zavrel's apartment turned up envelopes with the juveniles' names and addresses typed onto them, a partially used book of "Love USA" stamps (the same stamps that were affixed to the letters found in the Nanticoke post office), a partially empty box of cornstarch, and latex gloves. A number of clippings about the anthrax scare facing the nation were also found in the apartment. After Zavrel was arrested and taken from her residence

2

by the police, her roommate, Forman, admitted to investigators that she and Zavrel had mailed the letters in retaliation against the boys whom they believed had lied about the actions of Zavrel's son.

By indictment filed in July 2002, Zavrel was charged with conspiracy to mail threatening communications, in violation of 18 U.S.C. §§ 371 and 876 (Count 1); aiding and abetting the mailing of threatening communications, in violation of 18 U.S.C. § 876 (Count 2); and making a false statement to a federal officer, in violation of 18 U.S.C. § 1001 (Count 3).

Following a five-day jury trial, Zavrel was convicted on all counts, and the District Court imposed a sentence of 30 months' imprisonment for each count, to be served concurrently. At the end of the government's case and again at the end of the defense's case, defense counsel unsuccessfully moved for a judgment of acquittal on all counts. Following the jury verdict, defense counsel again filed a motion for judgment of acquittal, which the District Court denied.

This appeal followed.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction over this case pursuant to 18 U.S.C. § 3231. We exercise jurisdiction over the final judgment in this case under 28 U.S.C. § 1291.

Zavrel argues that because the issues on appeal concern the sufficiency of the evidence, we should apply a de novo standard in reviewing this case; the government argues that a "particularly deferential" standard should apply. See United States v. Cartwright, 359 F.3d 281, 286 (3d Cir. 2004) ("The verdict must be sustained if there is substantial evidence to support it") (citations omitted). Although Zavrel frames her appeal as one about the sufficiency of the evidence, her arguments actually concern issues of statutory interpretation, and we will therefore exercise plenary review. United States v. Thayer, 201 F.3d 214, 219 (3d Cir. 1999).

## III. DISCUSSION

Zavrel concedes that the government proved the following facts at trial: In October 2001, Zavrel and her then-roommate Emily Forman addressed seventeen envelopes containing loose cornstarch (but no written message) to the President of the United States, local public officials, school administrators, and judges, and deposited them in a mailbox in the Nanticoke, Pennsylvania Post Office. The envelopes bore the names and return addresses of two boys who had reported the criminal acts committed by Zavrel's son, which Zavrel felt unjustly led to her son's placement in juvenile detention. Zavrel informed an investigator that the letters were mailed "to make those kids pay for what they did," (Zavrel Brief at 5), and she admitted to Agent Bill Salvoski of the United States Secret Service that the cornstarch was used to make the envelopes appear as if they contained anthrax, and that she hoped it would result in the

3

juveniles being placed in detention.

Zavrel argues on appeal that this evidence was insufficient to convict her under counts one and two (the charges brought under 18 U.S.C. § 876), because she contends that mailing of cornstarch alone is insufficient to prove that she mailed a "communication" containing a "threat to injure" the addressee, under the statute. The relevant portion of the statute states:

> Whoever knowingly so deposits or causes to be delivered [by the United States Postal Service] . . . any communication with or without a name or designating mark subscribed thereto, addressed to any other person and containing . . . any threat to injure the person of the addressee or of another, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 876(c). The primary purpose of the statute is to prohibit the use of the mails to send threatening communications. Under this provision, the government must establish that Zavrel deposited, in the mails, a "communication" containing a "threat to injure" the addressee. It does not matter whether the communication is actually delivered. See Seeber v. United States, 329 F.2d 572, 573 (9th Cir. 1964) (upholding a conviction under 18 U.S.C. §

875(c) for threats made to a person other than the person the defendant intended to threaten).

Zavrel claims that her actions do not amount to a violation of the statute for two main reasons. First, she argues that absent the enclosure of a written message, the mailing of cornstarch cannot constitute a "communication" within the meaning of the statute. Second, Zavrel argues that she did not threaten the addressees of the letters, as required under the statute, because any harm caused by the mailings would have been immediate, and, she asserts, the statute only envisions prospective threats.

## A. WHETHER MAILING CORNSTARCH CONSTITUTES "COMMUNICATION"

Zavrel claims that Congress did not intend for the mailing of cornstarch to constitute "communication" under 18 U.S.C. § 876. The first step in discerning the meaning of a statute is to determine whether the language used "has a plain and unambiguous meaning with regard to the particular dispute in the case." Ki Se Lee v. Ashcroft, 368 F.3d 218, 222 (3d Cir. 2004) (citations omitted). See also Liberty Lincoln-Mercury, Inc. v. Ford Motor Co., 171 F.3d 818, 822 (3d Cir. 1999) ("In the absence of a specific statutory definition, the language of the statute should be given its ordinary meaning and construed in a common sense manner to accomplish the legislative purpose.") (internal quotations and citations omitted).

Zavrel argues that because Congress did not define "communication"

4

in 1948 when it amended the statute and codified the language under which Zavrel was charged, we must interpret the language as it would have been commonly understood in 1948. She argues that dictionaries in 1948 did not consider the mailing of cornstarch as falling within the definition of "communication." (Zavrel Brief at 11-12.) To support this point, Zavrel asserts that the 1948 American College Dictionary, published by Random House, defines communication as "the imparting or interchange of thoughts, opinions, or information by speech, writing or signs."[1] (Zavrel Brief at 21.) It is Zavrel's position that this definition could not possibly encompass the mailing of cornstarch.

We disagree with Zavrel's assertion that only the 1948 dictionary definitions of "communication" are relevant to our inquiry. Zavrel correctly notes that dictionary definitions can be helpful in discerning congressional intent, but we do not limit ourselves to dictionaries dating from a statute's enactment. See, e.g., Contents of Account Number 03001288 v. United States, 344 F.3d 399, 406 (3d Cir. 2003) (citing to a 1993 dictionary to define term in a statute enacted in 1930). Indeed, we recently cautioned that "[t]here is a limit . . . to how much can be proved by invoking dictionary definitions and usage. As the Supreme Court has said: We

consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme. [T]he meaning of statutory language, plain or not, depends on context." United States v. Loney, 219 F.3d 281, 285 (3d Cir. 2000) (quoting Bailey v. United States, 516 U.S. 137, 145 (1995) (internal quotations and additional citations omitted) (alternation in original).

Although it is unlikely that Congress envisioned this particular activity when enacting the statute, we are confident that mailing a white powdery substance intended to cause fear and distress plainly constitutes a communication under § 876. Dictionaries today, as well as those dating from Zavrel's preferred timetable, define communication as not only the transfer of information through speech and writing, but also through "signs" or "signals." See, e.g., MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 233 (10th ed. 1996) (defining "communication" as "a process by which information is exchanged between individuals through a common system of symbols, signs, or behavior"); see also THE AMERICAN COLLEGE DICTIONARY (1948) (Zavrel Brief at 21) (defining communication as "the imparting or interchange of thoughts, opinions, or information by speech, writing, or signs"). They define communication as the process by which information is conveyed between individuals. It can be verbal, written or symbolic. Symbols and objects that are used at the time a message is conveyed can affect the message's meaning, as can the environment in which the communication

_____

[1] Zavrel cites a number of other dictionaries from roughly the same period, which defined communication similarly.

is made. See United States v. Lewis, 220 F. Supp. 2d 548, 555 (S.D. W. Va. 2002).

Art, photography, dance, facial expression – all may be used to communicate ideas from one individual to another. The message does not have to be in writing to constitute a communication. For example, if an individual were to send another person a letter containing a photograph of the addressee with the addressee's head cut off, few would doubt that the sender in that case intends to convey a message of fear, fright, or alarm. In Pratt v. United States, 129 F.3d 54, 56 (1st Cir. 1997), the defendant was convicted under § 876 for mailing a mutilated pig carcass to a local police chief after the officer had confiscated several of the defendant's firearms. The defendant was found guilty and sentenced to a lengthy prison term. Id. In a different context, the Supreme Court has held cross burning, another non-verbal act, as one of "those forms of intimidation that are most likely to inspire fear of bodily harm." Virginia v. Black, 538 U.S. 343, 363 (2003).

Regardless of whether we accept Zavrel's 1948 definition or look to a more current source, we are convinced that, in the context of the 2001 anthrax scare, the mailing of cornstarch, meant to resemble anthrax spores, constituted a "communication" under § 876. We also note that Congress likely intended the statute to have a broader reach than Zavrel suggests, as evidenced in part by the fact that the 1948 amendment to the statute seems to have expanded its reach. Prior to 1948, the statute criminalized the mailing of "any written or printed letter or other communication . . . containing . . . any threat to injure the person of the addressee." 18 U.S.C. § 338(a), 52 Stat. 742, § 1, par. (b) (1939) (App. 29). In 1948, the statute was amended to criminalize the mailing of "any communication . . . containing . . . any threat to injure the person of the addressee." 18 U.S.C. § 876, par. 3 (1948) (App. 30). The amended statute omits any reference to "written or printed" material, thus making it clear that a communication need not be in writing.

In this case, we believe that in sending a substance meant to resemble anthrax, in envelopes addressed to various persons, Zavrel intended to convey a message – a message of fear, fright and alarm. Ultimately, Zavrel wanted to frame the boys whose addresses were typed on the envelopes. United States v. Lewis, a case decided in the context of the anthrax scare, presented a similar scenario. In Lewis, the defendant tried to frame his ex-girlfriend by sending four letters to public officials, including the President, containing an unidentified white powder, a cigarette butt, and a short note reading, "I were you [sic], I'd change my attitude." (A fifth letter was mailed to a private citizen and contained a different note reading, "It is on.") 220 F. Supp. 2d at 549. The court in Lewis determined that, viewed together, these items constituted threatening communications. The court noted specifically that, "[i]n the context of the post-September 11 anthrax outbreaks,

6

the mailing of any powdery substance through the postal system is clearly capable of being interpreted as a 'threatening' communication under sections 876 and 871." Id. at 557-58. The court also pointed out, "[t]he white powder included in the envelopes was mailed to various individuals at a time when people were receiving mail containing the biological agent anthrax." Id. at 558.

As in Lewis, the sender of the white powder-filled envelopes in this case communicated a message of apprehension, anxiety and fear about exposure to the powder. We therefore conclude that Zavrel's mailings constituted communications within the meaning of § 876. We next consider whether the communications conveyed a threat to harm the addressees.

## B. WHETHER ZAVREL'S MAILINGS CONTAINED THREATS

Zavrel argues that the phrase "threat to injure" in § 876 contemplates a prospective, not immediate, threat. Specifically, Zavrel contends that "§ 876 does not criminalize the mailing of injurious materials; it only criminalizes the mailing of communications containing a 'threat to injure.'" (Zavrel Brief at 15.) Although she concedes that her letters were injurious, she contends that they were *immediately* harmful to recipients, and did not contain *prospective* threats to injure. The government responds that a reasonable recipient of one of Zavrel's letters would not only be immediately injured in the sense that he would fear for

his life, but would also be fearful of future harmful action on the part of the sender.

Zavrel offers no precedential support for her notion that the phrase "threat to injure" in § 876 should be interpreted as prospective in nature.[2] The government contends that the focus of the inquiry here should be whether a reasonable person, familiar with the context in which a threat is communicated, would perceive the communication as a threat of harm. The government's position comports with how the District Court instructed the jury in this case:

---

[2]Zavrel does cite to United States v. Taylor, No. 02 Cr. 73 RPP, 2003 WL 22073040 (S.D.N.Y. Sept. 5, 2003) for the proposition that § 876 mandates that threatening communications be prospective. Taylor concerned a fake anthrax scare at the ABC Carpet store in New York City, and the defendant in that case was charged under 18 U.S.C. § 2332a(a)(2), which makes it unlawful to "threaten to use a weapon of mass destruction . . . against persons within the United States." Id. at *1. The court in that case held that the statute contemplated prospective threats. Taylor is an unpublished district court decision from New York, decided under a different statute than the one at issue here. And, in any case, we are not persuaded that the phrase "threaten to use" as interpreted in Taylor has the same impact as the phrase "threat to injure" as does our case.

A threat is a serious statement or communication which expresses an intention to inflict injury at once or in the future as distinguished from idle or careless talk, exaggeration or something said in a joking manner. A statement or communication is a threat if it was made under such circumstances that a reasonable person hearing or reading the statement or receiving the communication would understand it as a serious expression of intent to inflict injury . . . .

(App. at 1001-02).

We believe this to be the correct approach, although we do not need to decide the issue definitively here, because we believe the jury could have reasonably concluded that Donlyn and others who were exposed to Zavrel's mailings experienced both immediate harm as well as threats of future injury. A reasonable person opening an envelope containing a white powdery substance, during the height of the anthrax crisis in this country, would doubtless fear immediate and future injury. That is precisely what happened in this case. The same day that she opened the mailbox and touched the white powder, Cindy Donlyn went to a hospital emergency room for diagnosis. She testified that she remained there for about three hours.

Our interpretation of the phrase "threat to injure" comports with case law from other jurisdictions. In United States v. Malik, 16 F.3d 45 (2d Cir. 1994), a defendant in several lawsuits sent letters to judges threatening his adversaries. The Malik court defined "threat" as follows:

A threat is a statement expressing an intention to inflict bodily harm to someone of such a nature as could reasonably induce fear as distinguished from idle, careless talk, exaggeration or something said in a joking manner. . . . A serious expression of intent to inflict injury and not merely a vehement or emotional expression of political opinion, hyperbole or arguments against government officials.

Id. at 51. We believe that Zavrel's actions accord with the Malik definition: a recipient of one of Zavrel's envelopes would fear imminent harm and perhaps death upon seeing the white powder. The envelopes with white powder were non-verbal messages of the sender's intent to harm the recipients.

Even if we adopted Zavrel's assertion that the threats in the mailings must be prospective, we believe that Zavrel's mailings *did* contain threats of future harm. No doubt persons who were first exposed to Zavrel's mailings at the

8

Nanticoke post office were immediately dismayed when they discovered Zavrel's letters. It would be natural for any person in such a circumstance to be fearful of future harm. Donlyn's actions exemplify this. She testified that after she came in contact with the white powder at the post office she went to the hospital out of fear that exposure to the powder might cause her health problems.

Mailing cornstarch, or real anthrax for that matter, may be analogized to mailing a bomb (real or fake) or, as in the Pratt case discussed earlier, a dead animal. 129 F.3d at 56. The fact that some of the contents of these mailings may be immediately harmful does not alter the fact that the sender in each case intends to communicate prospective harm as well. Additionally, opening an envelope containing a white powder, in the circumstances described, could not only create an apprehension of immediate fear and future harm, but also communicates to the intended victim the sender's hostility and the idea that the sender has access to a deadly agent that he or she can use again in the future.

For these reasons, we determine that the jury in Zavrel's case properly concluded that Zavrel deposited a communication in the mails containing a threat to injure.

## IV. CONCLUSION

For these reasons, we conclude that, in the wake of the 2001 anthrax scare, mailing cornstarch does constitute a communication under 18 U.S.C. § 876.

We also conclude that Zavrel's mailings constituted threats to injure the recipient within the meaning of the statute, and we therefore affirm the judgment of the District Court.

9

STAPLETON, Circuit Judge, dissenting:

I agree with the Court's conclusion that the mailing of an envelope containing a white powdery substance in October 2001 constituted a "communication" within the meaning of 18 U.S.C. § 876. I cannot, however, agree with its interpretation of the phrase "containing . . . any threat to injure." In my view, the "threat to injure" contemplated by 18 U.S.C. § 876 requires the relevant communication to convey that some prospective action will be taken by the sender or the sender's confederates. To the extent that the Court would apply a broader reading of the statute than the one I suggest, I would conclude that the doctrine of lenity is clearly implicated. Accordingly, I respectfully dissent.

## I.

Rosemary Zavrel's conviction on counts one and two of her indictment cannot be sustained unless her conduct fell within the proscription of 18 U.S.C. § 876. That statute prohibits the mailing of "any communication . . . containing . . . any threat to injure," and the dispositive question, therefore, is whether Zavrel sent a communication containing a threat to injure. An analysis of this issue must proceed in two steps. The first is to determine the substance of the message conveyed by Zavrel's conduct. The second is to determine whether that message contained any threat to injure.

## A.

I agree with the majority that Zavrel's conduct in this case was communicative. Determining the message that was conveyed by her communication, however, is no easy task. Obviously, Zavrel made no verbal or written communication. Rather, her communicative conduct consisted of mailing envelopes that contained a white powdery substance to certain addressees in October 2001.

Our decisions suggest that the most appropriate way to determine the message conveyed by Zavrel's conduct is to consider what a person receiving one of these envelopes would reasonably perceive the message to be. *Cf. United States v. Himelwright*, 42 F.3d 777, 782 (3d Cir. 1994) ("[T]o establish a violation of 18 U.S.C. § 875(c), the government bore only the burden of proving that [the defendant] acted knowingly and willfully when he placed the threatening telephone calls and that those calls were reasonably perceived as threatening bodily injury."). Applying this test, I have little trouble concluding that a person receiving and opening Zavrel's envelope in October 2001 would believe that he had just been exposed to anthrax. I would therefore conclude that the message conveyed by this conduct would be reasonably interpreted as: "I have just exposed you to anthrax." This message, I believe, would also reasonably be perceived to include all additional inferences that a recipient could make

10

under the belief that he was being exposed to anthrax, such as: "You are now going to become ill as a result of this exposure," or even: "You are now going to die as a result of this exposure." In essence, however, the message conveyed by Zavrel's conduct amounts to no more and no less than: "I have just poisoned you."[3] The question therefore becomes whether the communication "I have just poisoned you" constitutes, as a matter of law, a

---

[3]The Court suggests that a person receiving one of Zavrel's envelopes could also perceive a message that the sender will send more anthrax in the future. I simply cannot agree that a recipient of the message "I have just poisoned you" would reasonably expect to receive more poison at a later point in time. In a case such as this, where the message perceived is based solely upon an object put through the mail, the message reasonably perceived must be limited to that which is conveyed by the nature of the object itself. As the majority suggests, a picture of the recipient without his head may reasonably connote future violence. But anthrax is a bacterial poison, and the message that one can reasonably perceive from the receipt of what appears to be anthrax is that he or she has just been exposed to a lethal poison. Given the nature of the object contained in the letter, there would be no reasonable basis for inferring the need for a second exposure and, accordingly, no reasonable basis for expecting or fearing one.

"communication . . . containing . . . any threat to injure."

## B.

The term "threat" has not been defined by Congress. It must therefore be "interpreted as taking [its] ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). Applying this rule of construction, numerous courts have attempted to define the term "threat" in the context of the federal threat statutes, 18 U.S.C. §§ 871-880. We have defined it as "'a serious expression of an intention to inflict bodily harm.'" *United States v. Kosma*, 951 F.2d 549, 557 (3d Cir. 1991) (quoting *Roy v. United States*, 416 F.2d 874, 877-78 (9th Cir. 1969)). The definitions adopted by other courts are substantially similar. *See, e.g.*, *United States v. Fulmer*, 108 F.3d 1486, 1490-91 (1st Cir. 1997); *United States v. Alkhabaz*, 104 F.3d 1492, 1495 (6th Cir. 1997); *United States v. Malik*, 16 F.3d 45, 51 (2d Cir.1994); *United States v. Khorrami*, 895 F.2d 1186, 1192 (7th Cir. 1990).

The message "I have just poisoned you" does not express the sender's intent to engage in any future conduct. Rather, it expresses that the sender's intent to inflict bodily harm has been satisfied upon receipt of the communication. This is significant because numerous courts require that, in order to constitute a "threat" within the context of the federal threat statutes, the communication must convey the message that bodily harm will be inflicted by the speaker (or a

11

confederate) in some future act.

For example, the Courts of Appeals for the Fifth and Eleventh Circuits have held that "[a] communication is a threat when 'in its context [it] would have a reasonable tendency to create apprehension that its originator *will act* according to its tenor.'" *United States v. Alaboud*, 347 F.3d 1293, 1296 (11th Cir. 2003) (quoting *United States v. Bozeman,* 495 F.2d 508, 510 (5th Cir. 1974)) (internal quotations omitted) (emphasis added). The Second Circuit Court of Appeals has taken a similar approach, stating that to qualify as a "threat," the communication must "'on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and *imminent prospect of execution . . . .*'" *New York v. Operation Rescue National*, 273 F.3d 184, 196 (2d Cir. 2001) (quoting *United States v. Kelner*, 534 F.2d 1020, 1027 (2d Cir. 1976)) (emphasis added). In distinguishing a "true threat" from a warning of danger, the same Court stated that "[a]lthough proof of the threat's effect on its recipient is relevant to this inquiry, . . . a court must be sure that the recipient is fearful of the execution of the threat *by the speaker* (or the speaker's co-conspirators)." *Id.* (citing *Malik*, 16 F.3d at 49) (emphasis in original). Furthermore, the Ninth Circuit Court of Appeals has stated that a threat exists when, after hearing the message, "the listener will believe he will be subjected to physical violence upon his person." *United States v. Orozco-Santillan*, 903 F.2d 1262, 1265-66 (9th Cir. 1990).

The requirement that a "threat" contemplate some future conduct by the speaker is also suggested in *Black's Law Dictionary*, which defines the term as including "[a] declaration of an intention to injure another or his property *by some unlawful act*." *Black's Law Dictionary* 1480-81 (6th ed. 1990) (emphasis added).

Based upon the foregoing, I cannot conclude that the message "I have just poisoned you" can constitute a "threat" within the meaning of § 876. Such a message bears no indication that any conduct will be forthcoming by the sender.

In this case, I have no doubt that a reasonable recipient of Zavrel's envelopes would believe that his health, and even his life, was in danger. That belief, however, could only have arisen from an event that had already occurred, *i.e.*, exposure to the white powdery substance, and not from any future conduct that was yet to be undertaken. Accordingly, I would conclude that Zavrel's conduct did not fall within the proscription of 18 U.S.C. § 876.

II.

The majority's interpretation of § 876 is significantly broader than I believe justified by the language "any communication . . . containing . . . any threat to injure." Even assuming, however, that the majority's interpretation is another rational reading of § 876, such an assumption would lead only to the conclusion that the ambit of the statute is

ambiguous as to whether it requires the relevant communication to state that the recipient will be injured by some future conduct of the sender. Any such ambiguity must be resolved in favor of lenity. *Jones v. United States*, 529 U.S. 848, 858 (2000) (citing *Rewis v. United States*, 401 U.S. 808, 812 (1971)).

"'[W]hen choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.'" *Id.* (quoting *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221-22 (1952)). As the Supreme Court has stated, "[t]here are no constructive offenses; and before one can be punished, it must be shown that his case is plainly within the statute." *McNally v. United States*, 483 U.S. 350, 360 (1987) (quoting *Fasulo v. United States*, 272 U.S. 620, 629 (1926)).

Using the mails to induce fear is not plainly within the ambit of § 876. The plain language of the statute, as I have suggested, indicates that the scope of conduct it proscribes is significantly more limited. I would therefore apply the rule of lenity and construe § 876 to cover only the more limited conduct.

III.

Because I conclude that Zavrel's conduct does not fall within the proscription of § 876, I would reverse the District Court's judgment and remand for sentencing solely on the count of making a false statement to a federal officer.

13