**STATE of Minnesota, Respondent,**

v.

**Anthony Frank FISCHER, Appellant.**

**No. C6–83–2012.**

Court of Appeals of Minnesota.

Aug. 14, 1984.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, John E. MacGibbon, Sherburne County Atty., Kim Brandell, Asst. County Atty., Elk River, for respondent.

C. Paul Jones, Public Defender, Brian I. Rademacher, Asst. Public Defender, Minneapolis, for appellant.

Considered and decided by POPOVICH, C.J., and PARKER and CRIPPEN, JJ., with oral argument waived.

## OPINION

PARKER, Judge.

Appellant Anthony Frank Fischer was convicted by a jury of three counts of terroristic threats in violation of Minn.Stat. § 609.713, subd. 1 (1982), misdemeanor obstructing legal process in violation of Minn. Stat. § 609.50 (1982), and misdemeanor assault in the fourth degree in violation of Minn.Stat. § 609.224, subd. 2 (1982). Appellant claims he was denied a fair trial by evidentiary rulings which allowed the State to impeach him with a prior conviction if he testified and to introduce evidence of three *Spriegl* incidents. He also contends the evidence was insufficient to convict him of terroristic threats. Finally, he claims the offenses arose out of the same behaviorial incident and the sentences exagerated the criminality of his conduct. We affirm.

## FACTS

Appellant was married to Janet (Bockoven) Fischer. They obtained a divorce in 1981. Since then, appellant has often told Janet of his love for her and of his interest in a reconciliation. Janet's sister is Vicki Griswold. Vicki's husband's best friend was Robert "Dale" Porter, who had dated Janet since 1980. By the date of trial, Janet and Dale had tentative plans to marry each other.

On April 4, 1983, at about 6:15 p.m., appellant telephoned Vicki at her home. Appellant expressed anger at other members of her family, blaming them for the breakup of his marriage. He made about six phone calls throughout that evening to Vicki over a period of about six hours. In two of the calls Vicki heard gunshot sounds, and appellant told her that he had a 30.06 rifle. The shooting was interspersed among comments by appellant that if Janet ever remarried, he would kill Dale Porter, Janet and himself. After one of the gunshots he told Vicki that he was shooting Porter in the head and said, "that was Porter" and that "he [appellant] splattered his [Porter's] brains on the wall."

Vicki telephoned Janet and also called the police to report that appellant had weapons.

Dale Porter testified that he was over at Vicki's home the evening when appellant called. Porter secretly listened in on two of the calls on an extension phone in the garage. He heard appellant ask Vicki something like, "what's Janet doing screwing around with that Porter character?" He also heard shots from a rifle followed by appellant's statement, "Hear that, Vicki? That's Porter's brains are all over the wall." This was repeated three or four times, with appellant saying, "I'm going to get him. He's a dead man." Porter also overheard appellant threaten to kill Janet, Porter and himself if Porter and Janet married.

Janet testified that on the night of April 4 Vicki called her and told her to be careful because appellant was angry. Janet later called the police to tell them that appellant was on a "rampage." Janet was informed the next day of appellant's specific threats.

At about 10:00 p.m. appellant made two telephone calls to Jerald Bockoven, Janet and Vicki's father. Jerald testified that appellant told him that he, Jerald, was the cause of all the trouble appellant has had. In both phone calls, Jerald heard two to four shots from a gun which sounded like a .22 rifle. Once, after discharging the rifle, appellant said the next one was for Jerald. At one point appellant said, "I'm going to smash your face up so it looks like a squashed tomato."

At about 11:30 p.m. officers of the Sherburne County Sheriff's Department arrived

at appellant's house following a call from appellant and a call from Janet. Appellant talked with Sergeant LeRoy Basavage, who testified that appellant was extremely disturbed and talked of suicide. The officers left to speak with Janet and Dale Porter, and they returned to appellant's house to arrest him. Appellant was still distraught and smelled of alcohol, although he did not appear intoxicated.

Upon being told he was under arrest, appellant refused to accompany the officers. Appellant swung and hit Basavage in the lip. He was restrained and eventually calmed down. He was released but later became upset again and reached out with his fists clenched. The officers handcuffed appellant and carried him away, kicking and struggling.

In appellant's house, bullet holes were discovered. The police received four rifles from appellant's brother, who had removed them from the house at appellant's request.

Appellant was charged with terroristic threats against Janet, Dale Porter and Jerald Bockoven, obstructing legal process, and assault in the fourth degree. Prior to trial, the State received permission to introduce evidence of three prior assaultive acts of appellant (*Spreigl* evidence): (1) On December 29, 1980, while separated from Janet, appellant held his family at gunpoint and threatened to commit suicide unless Janet was summoned to the scene. Appellant then surrendered to the authorities. (2) On September 7, 1981, appellant struck Janet in the face and body, causing her to fall from a chair and break a finger. (3) On October 1, 1981, appellant poured hot coffee down the front of Janet's dress. She was severely burned. Appellant was convicted of assault in the third degree for this incident. The jury did not learn of the conviction because, although the trial court had earlier ruled that the conviction was admissible for impeachment purposes, appellant did not testify.

At trial Janet Fischer and Jerald Bockoven both testified about all three of the *Spreigl* incidents. Vicki Griswold and Dale

Porter testified that they were aware of the two incidents involving injury to Janet.

The trial court gave cautionary instructions to the jury concerning the *Spreigl* evidence, once after the first *Spreigl* evidence was elicited and again in the final instructions. Following conviction on all five offenses, appellant was sentenced to concurrent executed sentences of 18 months, 21 months, 25 months, 12 months and 90 days.

## ISSUES

1. Was appellant denied a fair trial because of the trial court's ruling that his prior conviction was admissible for impeachment or its ruling that the *Spreigl* incidents were admissible?

2. Was the evidence sufficient to convict appellant of terroristic threats?

3. Did the sentences violate the prohibition against punishing an individual twice for a single behaviorial incident?

## ANALYSIS

### I

Appellant claims he was denied a fair trial because of certain trial court evidentiary rulings.

■ A. Appellant contends the trial court erred in its pretrial ruling that the State was permitted to use his prior conviction of assault in the third degree to impeach his credibility if he testified. Appellant did not testify. We do not find any clear abuse of discretion in letting the State use the prior conviction. *See State v. Brouillette*, 286 N.W.2d 702 (Minn.1979); *State v. Jones*, 271 N.W.2d 534 (Minn. 1978). A detailed analysis of the use of prior convictions for impeachment is in *State v. Heidelberger*, 353 N.W.2d 582 at 588–591 (Minn.Ct.App.1984); it is clear that the instant case similarly is lacking in error on this ground.

■ B. Appellant next complains about the trial court's decision declaring three prior *Spreigl* incidents admissible to show the prior relationship between appellant

and the victims of the terroristic threats. Prior to trial, the State sought to introduce about 15 prior acts committed by appellant. The trial court allowed three prior incidents to show appellant's relationship with the victims as bearing on his intent and motive at the time he made the threats.

The trial court's ruling was within its sound discretion. *State v. Kutchara,* 350 N.W.2d 924 at 926 (Minn.1984). Rule 404(b), Minn.R.Evid., provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

■ This evidence is admissible if "defendant's participation in the other crimes is clear and convincing, if the evidence is relevant and material to the state's case, and if the probative character of the evidence outweighs its potential for unfair prejudice." *Ture v. State,* 353 N.W.2d 518 at 521 (Minn.1984). The evidence of the other incidents was clear and convincing. Appellant challenges the revelance and the probative value of the evidence.

In the leading Minnesota case involving terroristic threats, the Minnesota Supreme Court allowed evidence of the defendant's prior homosexual relationship with the victim as "bearing upon the relationship between the accused and the victim and [establishing] a motive for the commission of the offense charged." *State v. Schweppe,* 306 Minn. 395, 402, 237 N.W.2d 609, 615 (1975). *See also State v. Gavle,* 234 Minn. 186, 207–08, 48 N.W.2d 44, 56 (1951).

Here it is clear the evidence of appellant's prior relationship with the victims was relevant to establish appellant's intent and motive for making the threats. *See State v. Roberts,* 350 N.W.2d 448 at 451 (Minn.Ct.App.1984).

■ Moreover, this evidence was relevant to the victims' reactions to the threats, which is "circumstantial evidence relevant to the element of intent of the defendant in making the threat." *Schweppe,* 306 Minn. at 401, 237 N.W.2d at 614.

Finally, the evidence was relevant in rebutting appellant's claim that his actions the night of April 4, 1983, were mere episodes of "transitory anger." Thus, no abuse of discretion was shown in admitting the *Spreigl* evidence. We reject appellant's contention that the repeated introduction of the evidence through several State's witnesses was unduly prejudicial.

## II

■ Appellant complains the evidence was insufficient as a matter of law to sustain his conviction of terroristic threats. Among his contentions are that his actions only expressed "transitory anger" and he was merely letting off steam and that he did not intentionally or in reckless disregard cause the threats to be communicated to Janet Fischer or Dale Porter, since the threats were made in phone calls to Vicki Griswold.

In passing on appellant's assertions, we are mindful of our scope of review.

> In reviewing a claim of insufficiency of the evidence, we are limited to ascertaining whether, given the facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged.

*State v. Merrill,* 274 N.W.2d 99, 111 (Minn. 1978). In doing so, we construe the record most favorably to the State and assume the evidence supporting the conviction was believed and the contrary evidence disbelieved. *State v. Pieschke,* 295 N.W.2d 580, 584 (Minn.1980).

> The terroristic threat statute provides:
> Whoever threatens to commit any crime of violence with purpose to terrorize another or to cause evacuation of a building, place of assembly or facility of public transportation or otherwise to cause serious public inconvenience, or in

a reckless disregard of the risk of causing such terror or inconvenience may be sentenced to imprisonment for not more than five years.

Minn.Stat. § 609.713, subd. 1 (1982). The essential elements of this offense were thoroughly discussed in *Schweppe*. The court stated:

> A threat is a declaration of an intention to injure another or his property by some unlawful act. * * * The test of whether words or phrases are harmless or threatening is the context in which they are used. * * * Thus, the question of whether a given statement is a threat turns on whether the "communication 'in its context' would 'have a reasonable tendency to create apprehension that its originator will act according to its tenor.'" * * *.
>
> Section 609.713, subd. 1, requires that defendant utter the threat with the purpose of terrorizing another. Purpose in this context means aim, objective or intention. * * * Terrorize means to cause extreme fear by use of violence or threats.

*Schweppe*, 306 Minn. at 399–400, 237 N.W.2d at 613–14.

We do not agree with appellant's characterization of his actions as "transitory anger." His actions continued for almost six hours and were consistent with his pattern of behavior for the 18 months following his separation from Janet. It is a mockery to suggest his actions were spur-of-the-moment threats. Further, his argument that he was merely blowing off a little steam is unsupported, as there are other methods of blowing off steam besides discharging firearms while threatening to kill people.

Appellant also claims the evidence is insufficient to show that he intentionally or with reckless disregard communicated a threat to Dale Porter or to Janet Fischer. In *Schweppe*, the defendant threatened the victims by uttering threats in the presence of and by conversing with friends and acquaintances of the victims. The Supreme Court determined the evidence supported a finding:

> that defendant knew, or had reason to know, and thus intended that his threats to kill [the victim] would be communicated to him. * * * The jury also may well have concluded that defendant at the very least recklessly risked the danger that his threats would be communicated and thereby would terrorize [the victim]. Other courts have concluded that a defendant need not directly communicate the threat to the intended victim to be guilty of making a criminal threat.

*Id.* at 400–01, 237 N.W.2d at 614 (citations omitted).

Here, appellant made the threats directly to Jerald and to Vicki, Janet's sister and wife of Dale Porter's best friend. This evidence clearly supports the finding that appellant knew or had reason to know his threats would be communicated to the victims or that he recklessly risked the danger that his threats would be so communicated.

### III

Appellant claims that the five sentences imposed were improper because they all arose out of the same behaviorial incident or, alternatively, the obstructing justice and assault offenses constituted a single behaviorial incident. Minn.Stat. § 609.035 (1982) provides:

> Except as provided in section 609.585, if a person's conduct constitutes more than one offense under the laws of this state he may be punished for only one of such offenses and a conviction or acquittal of any one of them is a bar to prosecution for any other of them. All such offenses may be included in one prosecution which shall be stated in separate counts.

In determining whether the offenses involved the same behavioral incident, we must examine whether "the underlying conduct was motivated by a desire on the defendant's part to obtain a single criminal objective or by two or more criminal objectives." *State v. Thomas*, 352 N.W.2d 526 at 529 (Minn.Ct.App.1984),

quoting *Mercer v. State,* 290 N.W.2d 623, 626 (Minn.1980). The focus is on the factors of time and place. *State v. Boley,* 299 N.W.2d 924, 926 (Minn.1980). We believe it is clear that appellant's intent in making the terroristic threats was clearly separate and distinct from assaulting the officer or in obstructing legal process.

Further, while it is a close question, the assault and obstruction offenses were separate and distinct. The initial assault occurred against one officer upon appellant being told he was under arrest. Later, after he calmed down and had been released, he obstructed legal process in a vain attempt at avoiding apprehension. These offenses were thus separately motivated and separated in time sufficiently to allow multiple punishment for his actions.

■ While acknowledging the multiple victim exception to Minn.Stat. § 609.035 (1982) (described in *State v. Gartland,* 330 N.W.2d 881, 883 (Minn.1983)), appellant argues that separate sentences unfairly exaggerated the criminality of his conduct because at the time he made the threats he was depressed, in a disturbed state of mind, suicidal and had been drinking. It is unclear how these alleged circumstances show the sentences exaggerate his criminality. Appellant was clearly aware there were multiple victims of his threats because he threatened more than one victim. *See State v. Rieck,* 286 N.W.2d 724, 727 (Minn.1979). His actions were also gratuitous in that they were not necessitated by any of his earlier actions against the earlier victims of his threats. *See State v. DeFoe,* 280 N.W.2d 38, 42 (Minn.1979). That appellant may have lost control over his emotions and gone on a 5½ hour rampage does not mean that he cannot be sentenced separately for each victim. *See State v. Kennedy,* 342 N.W.2d 631 (Minn.1984).

■ Appellant's alternative argument is that since the terroristic threats against Janet Fischer and Dale Porter arose from phone calls to only one person, Vicki Griswold, and involved the single objective of discouraging Janet from remarrying, sepa-

rate sentences for these two counts unfairly exaggerated the criminality of his conduct. This argument, while creative, is also unsupported and we decline to create an exception along the lines suggested by appellant.

## DECISION

Appellant was not denied a fair trial because of the trial court's evidentiary rulings admitting a prior conviction for impeachment and admitting *Spreigl* evidence. The evidence was sufficient to convict appellant of terroristic threats. Appellant's sentence did not unfairly exaggerate the criminality of his conduct or punish him twice for a single behavioral incident.

Affirmed.