UNITED STATES of America,
Plaintiff,

v.

Edward Lee LEWIS, Defendant.

No. CR.A. 2:02–00042.

United States District Court,
S.D. West Virginia,
Charleston Division.

Sept. 11, 2002.

Bryant J. Spann, AUSA, Charleston, WV, for United States.

Carl J. Dascoli, Jr., Charleston, WV, for Edward Lee Lewis.

## MEMORANDUM OPINION AND ORDER

GOODWIN, District Judge.

Edward Lee Lewis was indicted on four counts of mailing threatening communications in violation of 18 U.S.C. § 876 (2002), one count of mailing a threat to the President in violation of 18 U.S.C. §§ 871 & 2(b) (2002), and one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), & 924(e)(1) (2002). Prior to trial, Lewis filed a motion in limine to exclude the testimony of the Government's expert witness, forensic document analyst John W. Cawley, III, under Rule 702 of the *Federal Rules of Evidence.* The court **GRANTED** the motion, finding that Mr. Cawley's testimony was not sufficiently reliable to meet the standards for expert testimony under Rule 702, as explicated by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). At trial, after the close of the Government's evidence and at the close of all the evidence, the defendant moved for a judgment of acquittal based on insufficiency of the evidence pursuant to Rule 29(a) of the *Federal Rules of Criminal Procedure.* The court **DENIED** the motions. The defendant now moves for a judgment of acquittal pursuant to Rule 29(c), and for a new trial pursuant to Rule 33 [Docket 82]. The court **DENIES** that motion. The court writes to further explain its rulings.

## I. Background

At issue in this case are five letters mailed within Kanawha County, West Virginia, between January 2 and January 11, 2002, each of which contained an unidentified white powder, a cigarette butt, and a note. Of the notes, four are identical photocopies of a handwritten note reading "I were you [sic], I'd change my attitude." The fifth letter, received by a private citizen, Robert Burford, in Kelley's Creek, contained a different note reading, "It is on." Letters were addressed and sent to the following: Robert Burford; Kanawha County Circuit Judge Charles King; Chief United States District Judge Charles H. Haden II; Bob Wise, Governor of West Virginia; and President George Bush.

Many people who incidentally were exposed to the mailings testified that they felt intense fear and apprehension upon the observation of the powdery substance contained in each envelope. All of these persons believed that they possibly were exposed to the lethal anthrax virus.

The return address for each envelope bore the name "Gloria Fields" and an address in Cross Lanes, West Virginia. The United States Postal Inspector, W. Burl Fluharty, questioned Gloria Fields on January 7, 2002, and again on January 11, 2002. During these interviews Ms. Fields said that she did not send the letters. The return addresses on the letters did not accurately reflect Ms. Fields's address. When presented with copies of the notes, Ms. Fields acknowledged that they were photocopies of her handwriting. Ms. Fields also told the inspectors that the text of the notes was taken from a letter she

had written and delivered to her ex-boyfriend, Edward Lee Lewis.

On January 11, 2002, United States Magistrate Judge R. Clarke VanDervort signed an arrest warrant and criminal complaint charging Lewis with mailing threatening communications in violation of 18 U.S.C. § 876. That evening, federal agents arrested Lewis at the home of his aunt and uncle. Based on observations made during the arrest, agents obtained a warrant to search Lewis's truck. While executing that search warrant, federal agents recovered several photocopied notes identical to those found in the mailings; the original note from which the copies apparently had been made; an envelope bearing the handwritten addresses of two recipients of the threatening notes, Chief Judge Haden and Governor Wise; two out-dated typewriters with ribbon; a twelve-gauge shotgun; and thirty-one twelve-gauge shotgun shells.

In an interview following his arrest, Lewis told Inspector Fluharty and F.B.I. Special Agent Allen Little that everything in the truck, with the exception of "some trash," belonged to him. Lewis, however, denied sending the threatening letters. As support for his denial, Lewis further explained that the officers would see he was not guilty when the letters kept coming after he was in jail.

On February 7, 2002, the defendant, Edward Lee Lewis, was indicted on four counts of mailing threatening communications in violation of 18 U.S.C. § 876 (2002), one count of mailing a threat to the President in violation of 18 U.S.C. §§ 871 & 2(b) (2002), and one count of being a felon in possession of a firearm in violation of 18

U.S.C. §§ 922(g)(1), 924(a)(2), & 924(e)(1) (2002).[1]

Lewis's jury trial took place on August 13 through August 15, 2002. On August 6, 2002, Lewis's attorney filed a motion in limine under *Daubert* to exclude the anticipated handwriting analysis testimony of John W. Cawley, III. The court held a *Daubert* hearing on August 13, 2002. At the conclusion of the hearing, the court granted the defendant's motion, finding that the Government did not meet its burden under Rule 702 to demonstrate that Cawley's testimony as an expert was reliable.

On August 15, 2002, at the close of the Government's evidence, the defendant moved for judgment of acquittal under Rule 29 under the *Federal Rules of Criminal Procedure*. The court denied this motion. On August 22, 2002, Lewis timely renewed his motion for acquittal under Rule 29(c), and alternatively moved for a new trial pursuant to Rule 33. In these motions, Lewis argued that there was insufficient evidence to support his conviction and that the court, in response to a question from the jury, erred in instructing the jury to continue deliberating after a question from the jury indicated an eleven-to-one deadlock.

## II. Discussion

### A. Admissibility of Handwriting Expert

▉ The primary question posed by the defendant's motion to prohibit the testimony of forensic document analyst John W. Cawley, III was whether his handwriting identification evidence was sufficiently reli-

---

1. At trial, Lewis stipulated that he is a convicted felon and that his right to possess a firearm has not been restored. As a result, Count Six of the indictment was redacted to remove specific reference to Lewis's three prior convictions for the violent felony of daytime burglary. These three violent felony convictions qualified Lewis for punishment as an armed career criminal under 18 U.S.C. § 924(e)(1).

able to be admissible pursuant to Rule 702 and *Daubert.* *See Fed.R.Evid.* 702; *Daubert,* 509 U.S. at 579, 113 S.Ct. 2786. The Government argued that the court was not required to apply *Daubert* to handwriting identification analysis and that, in any event, Mr. Cawley's testimony was reliable.

The court first notes that Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Fed.R.Evid.* 702. As the Supreme Court explained in *Daubert* and *Kumho Tire,* under Rule 702, the district judge must ensure that the expert's testimony is both relevant and reliable before it may be admitted, regardless of whether the testimony is scientific or based on technical or other specialized knowledge. *See Kumho,* 526 U.S. at 147, 119 S.Ct. 1167; *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786. When the expert's testimony's "factual basis, data, principles, methods, or their application are called sufficiently into question, ... the trial judge *must* determine whether the testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'" *Kumho,* 526 U.S. at 149, 119 S.Ct. 1167 (emphasis added) (quoting *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786).

In performing this gate-keeping responsibility, the Supreme Court has articulated four factors the court may consider:

(1) Whether a theory or technique can be or has been tested;

(2) Whether it has been subjected to peer review and publication;

(3) Whether, in respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation; and

(4) Whether the theory or technique enjoys general acceptance within a relevant scientific community

*Id.* at 149–50, 119 S.Ct. 1167 (citing *Daubert,* 509 U.S. at 592–94, 113 S.Ct. 2786) (internal quotations marks and alterations omitted). These various factors are not an exhaustive list of all possible ways to assess reliability, nor must all of the factors be applied in every case. *Id.* at 150, 119 S.Ct. 1167. Depending on the facts of the case and the type of testimony being challenged, it may very well be unreasonable to apply all of these factors. *Id.* at 151, 119 S.Ct. 1167. Accordingly, the trial judge is given discretion in determining how and in what manner to make reliability determinations pursuant to *Daubert.*

Where, however, the *Daubert* factors are reasonable measures of the testimony's reliability, the Supreme Court has instructed that the trial judge *should* consider them. *Id.* at 152, 119 S.Ct. 1167. While district courts have considerable leeway in determining how to assess reliability, they do not have the discretion to simply abandon their gate-keeping function by foregoing a reliability analysis. *Id.* at 158–59, 119 S.Ct. 1167 (Scalia, J., concurring). Significantly, "[i]n a particular case the failure to apply one or another of [the *Daubert* factors] may be unreasonable, and hence an abuse of discretion." *Id.* (Scalia, J., concurring).

This court is not persuaded by the Government's argument that the court need not apply the *Daubert* factors. For support, the Government cites several cases where circuit panels have affirmed a dis-

trict court's admission of a handwriting expert. *See, e.g., United States v. Jolivet,* 224 F.3d 902, 905–06 (8th Cir.2000) (affirming under plain error review the district judge's decision to admit handwriting expert's testimony without applying *Daubert* factors); *United States v. Paul,* 175 F.3d 906, 910–11 (11th Cir.1999) (concluding summarily that *Daubert* factors do not necessarily apply to admission of handwriting expert, but failing to address any alternative measures of reliability); *United States v. Velasquez,* 64 F.3d 844, 849–50 (3d Cir.1995) (cautioning against strict application of the reliability requirement and finding that the ultimate touchstone is helpfulness to the trier of fact).

While these cases all emphasize the district judge's discretion in choosing how to assess the expert's reliability and the "flexibility" afforded the court under *Daubert* and *Kumho,* they do not provide any rationale for declining to apply the *Daubert* factors. These courts simply downplay their rejection of the *Daubert* factors by minimizing the importance of reliability. The rationale given in these cases is that reliability in the handwriting identification context is a less significant concern due to the fact that the jury is able to see for itself whether the writings are similar. *See, e.g., Paul,* 175 F.3d at 911; *United States v. Jones,* 107 F.3d 1147, 1160–61 (6th Cir.1997) (citing *United State v. Buck,* No. 84 Cr. 220–CSH, 1987 WL 19300, at *3 (S.D.N.Y. Oct.28, 1987)).

The Supreme Court's mandate in *Daubert,* however, runs contrary to this rationale. There, the Court explained that Rule 702's requirement that evidence "assist the trier of fact in reaching its conclusion" goes primarily to relevance; an assessment of reliability is an *additional* component of the judge's gatekeeper function. *Daubert,* 509 U.S. at 591–92, 113 S.Ct. 2786. Simply put, expert testimony that does not relate to any issue in the case is not relevant, and thus, not helpful. Reliability, on the other hand, is an assessment of whether the expert's reasoning or methodology is valid and warrants the relaxation of the common law first-hand knowledge requirement for witnesses. *See id.* at 592, 113 S.Ct. 2786.

Here, the court finds that all of the *Daubert* factors reasonably apply to handwriting analysis and thus are helpful to the court in assessing the reliability of Mr. Cawley's testimony. As a branch of forensic science, handwriting analysis has many characteristics that are resonant with the traditional concept of "science." *See Reference Manual on Scientific Evidence,* Federal Judicial Center 69 (2000) (noting that "science" embodies the vast array of knowledge about the mysteries of our world, including the technologies which have transformed our lives). Handwriting analysis proposes a theory that each person's handwriting is unique, and involves a method by which a trained expert can identify each writing's author. The sufficiency of that theory and method can be tested through the basic factors set forth in *Daubert.*

For instance, because the results in handwriting analysis are based on identification, there must be a corresponding probability of error. *See* D. Michael Risinger & Michael J. Saks, *Science and Nonscience in the Courts:* Daubert *meets* Handwriting Identification Expertise, 82 Iowa L.Rev. 21, 36 (1996). In other words, it is possible to calculate the number of times a handwriting expert correctly identifies the author of a handwriting sample. *Id.* This number can then be used by courts as an indicative error rate. Other qualities of handwriting analysis, such as the theory that penmanship characteristics are separable from each other, and that there is a base rate of penmanship characteristics in a population of potential au-

thors, are also capable of measurement. *Id.* at 36–37.

Yet despite the relative ease with which such measurements could be made, the Government did not offer any evidence of reliable testing and error rates, or of any of the other *Daubert* factors through Mr. Cawley's testimony. The Government had the burden of establishing by a preponderance of the evidence that Mr. Cawley's expert testimony was sufficiently reliable to be admissible under Rule 702. *See Maryland Cas. Co. v. Therm–O–Disc, Inc.,* 137 F.3d 780, 783 (4th Cir.1998). The court found that the Government did not meet its burden.

On direct, Mr. Cawley testified that he

1) currently works as a forensic document analyst at the U.S. Postal Inspection Service Crime Laboratory in Dulles, Virginia, and has been employed there since 1977.

2) is certified as a questioned document analyst, a certification he received after completing two years of formal training with the U.S. Postal Service Crime Laboratory and one year of training under "recognized experts."

3) has testified approximately seventy times in courts as a questioned documents expert and has taught basic inspector training classes for the Postal Inspection Service.

Tr. 1–3. With respect to the theories and principles behind handwriting analysis, Mr. Cawley testified to the following:

1) The central tenet behind handwriting identification is that no two individuals write identically. He supported this testimony by stating that "this basic principle of handwriting identification has been proven time and time again through research in my field, as well as recently through a study that was conducted out of the University of Buffalo by a Dr. Srihari." Tr. at 4.

2) Document analysts have performed research studies in the field and have published papers in the relevant journals, though Mr. Cawley could not recall specific names of articles or authors. Tr. at 4–5.

3) These research studies are subject to a peer review process, namely symposia and annual meetings of the American Society of Questioned Document Examiners. Mr. Cawley also discussed a system in his own office by which each document examiner's work is re-examined by another examiner. Tr. at 6–7.

4) The laboratory where Mr. Cawley works submits each examiner to a proficiency test each year, which it administers, and since 1989, Mr. Cawley's passage rate has been 100%. Tr. at 8.

5) The error rate of questioned document analysts has been determined by one study by Dr. Moshe Kam, and that study states the error rate of professional document examiners is 6% and the error rate of lay persons is 38%; these rates only applied to cursive writing. Tr. at 10–11.

6) Generally, the field of handwriting analysis is an old and venerated profession, however, Mr. Cawley would not categorize his skills as those gained by scientific knowledge, but rather as a skill gained through specialized knowledge, training, or experience. Tr. at 9 & 12.

On cross-examination and upon questioning by the court, the following testimony was elicited:

1) Mr. Cawley does not possess a college or masters degree in forensic science, but is currently working toward completing his degree requirements for a B.S. in personnel labor relations. Tr. at 16–17.

2) When asked about the error rate of print writing as opposed to cursive writing, he asserted that he could not speak on the error rate. Tr. at 14–15. When asked about the existence of other studies than the ones he mentioned on direct examination, Mr. Cawley testified generally as to the existence of "[r]esearch papers throughout the community … published articles in various journals." Tr. at 38–39. When asked to elaborate, he stated the existence of studies addressing the frequency of certain handwriting characteristics, European handprinting analysis, and class characteristics of Latin American, African, and Asian handprinting. Tr. at 40–41. A few of the authors' names were provided, but the titles of the articles were not supplied. Tr. at 40–41. When asked by the court about the error rate of these studies and whether any of the studies had been replicated, Mr. Cawley admitted that he did not know. Tr. at 40–41. He also stated that other than the Kam studies mentioned in his testimony, he was unaware of any studies that address the potential error rate of forensic document examiners. Tr. at 47. When asked about the error rate of the Srihari study that he mentioned, Mr. Cawley again admitted that he did not know. Tr. at 44.

In sum, Mr. Cawley could not testify about the substance of the studies he cited. He did not know the relevant methodologies or the error rates involved in these studies. His bald assertion that the "basic principle of handwriting identification has been proven time and time again through research in [his] field," without more specific substance, is inadequate to demonstrate testability and error rate.

There were aspects of Mr. Cawley's testimony that undermined his credibility. Mr. Cawley testified that he achieved a 100% passage rate on the proficiency tests that he took and that all of his peers *always* passed their proficiency tests. Mr. Cawley said that his peers *always* agreed with each others' results and *always* got it right. Peer review in such a "Lake Woebegone" environment is not meaningful.

Mr. Cawley also failed to offer any substantive explanation of the standards used in the field of handwriting analysis. Although he stated that stroke similarities are required to make a positive match, he was unclear as to how many similarities are required for positive identification. Mr. Cawley had no explanation for why twenty-five samples of writing were necessary for a comparison of handwriting. He simply said that twenty-five samples was the number generally used. Finally, while there may be general acceptance of the theories and techniques employed in handwriting analysis among the "forensic evidence community," this acceptance does not demonstrate reliability. If courts allow the admission of long-relied upon but ultimately unproven analysis, they may unwittingly perpetuate and legitimate junk science.

After a careful review of the *Daubert* factors, the court found that it would have been improper to admit expert testimony based on principles and methodologies that have yet to be proven through proper testing. By excluding Mr. Cawley's testimony, the court did not hold that handwriting identification testimony is not reliable. Rather, the court narrowly held that handwriting analysis is susceptible to testing for reliability. The Government failed to offer evidence to prove that such testing had been done and the court **GRANTED** the defendant's motion in limine.

## B. Motions for Acquittal

### 1. Rule 29(a) Motion for Acquittal

■ At the close of the Government's evidence at trial, the defendant made a motion for judgment of acquittal pursuant to Rule 29. The defendant asserted that there was insufficient evidence to submit to the jury, and in the alternative, that the communications delivered by the United States Postal Service in this case could not reasonably be construed as "threatening communications" as contemplated in either 18 U.S.C. §§ 876 or 871. The court **DENIED** the motion, noting that there was overwhelming evidence that the defendant committed the alleged acts. The court also found that the contents of the mailed envelopes could be construed as "threatening communications," and writes further to explain that ruling.

Section 876 provides that a defendant must knowingly mail a "communication" which threatens to injure the addressee or any other individual. *Id.* § 876. Similarly, section 871 prohibits the mailing of "any letter, paper, writing, print, missive, or document containing any threat" to injure the President. *Id.* § 871. Section 871 does not contain the term "communication" as argued by the defendant. Section 876 includes "communication," but does not define the term. Courts normally construe undefined statutory language in accordance with its ordinary meaning. *United States v. Alvarez–Sanchez*, 511 U.S. 350, 357, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994) (quoting *FDIC v. Meyer*, 510 U.S. 471, 476, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994)). Because the envelopes mailed in this case involved ambiguous written messages, white powder, and a cigarette butt, the court looked to the plain meaning of the term "communication" to determine whether post-September 11, a "communication" under section 876 may be composed of substances, as well as words. That question appears to be a matter of first impression.

### a. Plain meaning of "communication"

A communication is that which makes something known to others. A communication is as robust as the context within which it is delivered and received. The medium used and the environment existing at the time of the transfer of the thought shape and are a part of the message. Words in bold type or the use of scented paper affect the content of a writing. Tone and volume impart meaning to oral communications. Simply put, a "communication" includes much more than words.

Webster's dictionary defines "communication" as the "exchange of thoughts, messages, or information, as by speech, signals, or writing." *Webster's II New College Dictionary* 227 (1995). Yet this definition fails to address how symbols, objects, or the environment at the time of the message's transfer may affect the meaning of the communication. The Fourth Circuit has adopted a similar definition, stating that "communication" means "a process by which information is exchanged between individuals through a common system of symbols, signs, or behavior." *United States v. McNulty*, 47 F.3d 100, 104 (4th Cir.1995) (quoting *Webster's Ninth New Collegiate Dictionary* 266 (1984)). This definition highlights that the means by which a message is transferred is important to the overall content of the message.

At issue in this case is whether, taken together, an unidentified white powder, a cigarette butt, and a note constitute a "communication" as that term is used in 18 U.S.C. § 876. In order to determine if the combined content of these mailings fits within the definition of "communication," it is useful to examine the way in which

courts have interpreted that term in other contexts.

b. "Communication" and the First Amendment

In the context of constitutional law, the Supreme Court has long recognized that application of the First Amendment is not limited to verbal speech alone, or even to language. Expressive conduct and symbolic speech also clearly fall within the ambit of first amendment protection. In determining whether particular conduct possesses sufficient "communicative elements" to implicate the First Amendment, courts look to whether there was an intent to convey a particularized message, and whether there was a high likelihood that the message would be understood by those who viewed it. *See Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (quoting *Spence v. Washington,* 418 U.S. 405, 409, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974)).

For instance, the United States Supreme Court has recognized the expressive and communicative elements present in a demonstration in which an individual burned an American flag to demonstrate his feelings toward the Reagan administration, *Johnson,* 491 U.S. at 399, 109 S.Ct. 2533; where students wore black armbands in protest of American involvement in the Vietnam War, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); in a sit-in by blacks in a "whites only" area to protest segregation, *Brown v. Louisiana,* 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966); where students wore American military uniforms in a dramatic presentation criticizing American involvement in the Vietnam War, *Schacht v. United States,* 398 U.S. 58, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970); and of picketing in general, *see, e.g., Food Employees v. Logan Valley Plaza, Inc.,* 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968); *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983). Thus, the Court has clearly articulated its view that symbolic, non-verbal forms of communication "sufficiently imbued with elements of communication' to implicate the First Amendment." See *Johnson,* 491 U.S. at 405, 109 S.Ct. 2533.

c. "Communication" and the Fifth Amendment

Similarly, the term "communication" is defined within the context of the Fifth Amendment's privilege against compulsory self-incrimination. The privilege "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." *Pennsylvania v. Muniz,* 496 U.S. 582, 589, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (quoting *Schmerber v. California,* 384 U.S. 757, 761, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)). "[I]n order to be testimonial, an accused's communication must, explicitly or implicitly, relate a factual assertion or disclose information. Only then is a person compelled to be a 'witness' against himself." *Id.* (quoting *Doe v. United States,* 487 U.S. 201, 210, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1988) (*Doe II* )).

Significantly, the Supreme Court has always understood the Self–Incrimination Clause to refer to testimony in all of its forms, whether communicated by voice or through physical acts. *See Muniz,* 496 U.S. at 595 n. 9, 110 S.Ct. 2638 (noting that the definition of testimonial communication "applies to both verbal and nonverbal conduct" because "nonverbal conduct contains a testimonial component whenever the conduct reflects the actor's communication of his thoughts to another") (citations omitted); *Doe II,* 487 U.S. at 211 n. 10, 108 S.Ct. 2341 (analyzing the *Schmerber*-line of cases and concluding that *Schmerber* dis-

cussed the fifth amendment privilege "in the context of clarifying that the privilege may apply not only to verbal communications, as was once thought, but also to physical communications") (citing *United States v. Wade*, 388 U.S. 218, 223, 87 S.Ct. 1926, 18 L.Ed.2d 1149, (1967)). The Court has found that even the *act* of producing subpoenaed documents, as opposed to the making of a statement, may contain protected testimonial aspects because the act of subpoenaing may involve implicit factual communications. *See Doe II*, 487 U.S. at 206, 108 S.Ct. 2341; *United States v. Doe*, 465 U.S. 605, 613 & n. 11, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984) (*Doe I*); *Fisher v. United States*, 425 U.S. 391, 409–10, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). The scope of the Fifth Amendment's protection of testimonial communications clearly encompasses both verbal and nonverbal conduct.

#### d. State Terrorism Laws

State courts have considered what constitutes a threatening "communication" within the context of terrorism laws. In *State v. Murphy*, the Minnesota Supreme Court examined whether a defendant's violent, non-verbal conduct contained communicative elements to invoke the state's terrorism threat law. 545 N.W.2d 909, 912 (Minn.1996). The defendant's conduct included placing dead animal and animal parts, birds, cats, rabbits, deer, and squirrels at his victims' houses; planting fake bombs; dumping oil and blood on houses; puncturing over 150 tires, breaking car windows, egging houses and garages; and placing broken beer bottles in front of a garage. *Id.* The *Murphy* court concluded:

> Many physical acts considered in context communicate a terroristic threat. We may find our examples in the case law, such as drawing a finger across one's throat or discharging a firearm over the telephone, *see State v. Lavastida*, 366 N.W.2d 677, 679 (Minn.App.1985), *State*

> *v. Fischer*, 354 N.W.2d 29, 34 (Minn. App.1984); in the movies, such as boiling a rabbit on the stove in the tranquil setting of a former paramour's new family home, or placing a severed horse's head in a bed; or as here, depositing dead animals at a residence or planting a fake bomb. Life is replete with such examples, and whatever the source, the principle is the same: physical acts communicate a threat that its "originator will act according to its tenor." *State v. Schweppe*, 306 Minn. 395, 237 N.W.2d 609, 613 (1975).

*Id.* at 915.

Likewise, the Court of Appeals of Wisconsin, in an unpublished case, found that Wisconsin's terrorism law was not limited to verbal representations or statements. Rather, the court looked at the surrounding facts of the situation when it assessed whether a communication was "threatening" pursuant to its terrorist threat law. *See State v. Farr*, No. 96–2551, 1999 WL 85543, at *2–*4, 1999 Wisc.App. LEXIS 115, at *7–10 (Wis.Ct.App. Jan. 28, 1999). In *Farr*, the defendant confronted two utility workers, who had just carried out their assigned task of disconnecting Farr's electric service. *See id.* While holding a rifle, he stated to them: "If I were you, I'd hook that back up." *Id.* at *4. The Wisconsin court found that Farr's comments, along with his accompanying conduct in holding the rifle, constituted the threatening communication. *See id.* at *4.

#### e. What Constitutes a "Threatening" Communication

As to the defendant's contention that the communication can not reasonably be considered "threatening," the court disagrees. In the context of the post-September 11 anthrax outbreaks, the mailing of any powdery substance through the postal system is clearly capable of being interpreted as a

"threatening" communication under sections 876 and 871. Considering the evidence in the light most favorable to the government, the court finds that a reasonable recipient would interpret the mailed communication as a threat of injury. *See United States v. Roberts*, 915 F.2d 889, 891 (4th Cir.1990) (citing *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942)).

The dictionary, the First Amendment, the Fifth Amendment, and state courts all incorporate conduct and symbols, as well as oral and written language, in the definition of "communication." Because communications involve a sender, a recipient, and the environment in which the communication is made, numerous factors beyond mere language comprise the eventual idea that is communicated. Here, the court finds that a communication may include statements and/or any non-verbal elements that make up the communication. The white powder included in the envelopes was mailed to various individuals at a time when people were receiving mail containing the biological agent anthrax. These mailings clearly conveyed a threatening message. Accordingly, the court **DENIED** the defendant's motion for acquittal.

### 2. Rule 29(c) Motion for Acquittal and Rule 33 Motion for a New Trial

█ Six days after the jury's guilty verdict on all counts, the defendant renewed his motion for judgment of acquittal under Rule 29(c) and made an alternative motion for a new trial pursuant to Rule 33. The defendant argues that there was insufficient evidence to sustain conviction of the offenses charged in Counts One, Two, Three, Four, Five, and Six of the Indictment, and that the court erred in instructing the jury to continue deliberating after a question from the jury indicated an eleven to one deadlock. The court **DENIES** the motion.

### a. Rule 29(c)

A trial court should deny a motion for judgment of acquittal if, when "viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt." *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982). The Government is entitled to the benefit of all reasonable inferences in the determination of whether to grant a motion for judgment of acquittal. *Id.* In addition, the Fourth Circuit has made clear that a defendant raising such a challenge "bears a heavy burden." *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir.1997).

Applying these standards to the defendant's motion, the court finds that the defendant's arguments are without merit. The Government produced overwhelming evidence at trial to support conviction on Counts One through Five, mailing threatening communications in violation of 18 U.S.C. §§ 2(b), 871 & 876 (2002). The following is a summary of the evidence provided by the Government against the defendant.

Federal agents found the original cut-and-paste version of the threatening note at issue in this case while executing a valid search of the defendant's truck on January 12, 2002. The threatening note was pasted on stationery that matched a different letter received by Robert Burford, a recipient of a threatening note. Agents recovered from the truck (1) the handwritten letter of Gloria Fields to the defendant from which the text of the threatening note had been cut, and (2) typewriters similar to the typewriters that produced the return addresses on the envelopes containing the threatening letter. Other convincing evidence proffered by the Government supporting the defendant's convictions included: (1) letters similar to those forming the basis of the charges in Counts One

through Five recovered from an inmate at South Central Regional Jail bearing the defendant's fingerprints, and (2) an additional threatening note found in the defendant's jail cell. For these reasons, the court **FINDS** that there was a sufficient evidence for the jury to convict the defendant on Counts One through Five for mailing threatening communications.

The defendant also challenges his conviction on Count Six, being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) & 924(a)(2) (2002). The defendant's only challenge to this conviction, asserted at trial and not further articulated in this pending motion, is that he did not "knowingly" possess a shotgun. During the execution of a valid search warrant, the gun in question was found in the backseat of the defendant's truck, along with numerous shotgun shells found throughout the truck's interior. Accordingly, the court **FINDS** that there was sufficient evidence for the jury to find that the defendant possessed the shotgun knowingly and to convict on Count Six.

b. Rule 33

■ The defendant also argues for a new trial under Rule 33, asserting that the court erred (1) in instructing the jury to "keep deliberating" after being informed by an unsolicited note that the jury was deadlocked, and (2) in failing to give an *Allen* charge to the jury after receiving that note.

A trial court has more latitude in determining whether to grant a motion for new trial. A district court may grant a new trial in the interest of justice under Rule 33. *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir.1985). While Rule 33 gives a district court discretion to grant a new trial "if required in the interest of justice," a motion for new trial based on any ground other than "the ground of newly discovered evidence" must be made within seven days of a verdict. *United States v. Lawhorne*, 29 F.Supp.2d 292, 302 (E.D.Va.1998). In general, "the remedy of a new trial is sparingly used, and then only where there would be a 'miscarriage of justice' and 'where the evidence preponderates heavily against the verdict.'" *United States v. Indelicato*, 611 F.2d 376, 387 (1st Cir.1979) (quoting *United States v. Leach*, 427 F.2d 1107, 1111 (1st Cir.1970)).

With respect to the defendant's first assignment of error, i.e., the court's instruction to the jury to "keep deliberating," after being informed that the jury was deadlocked eleven to one, the court notes that at that time, defense counsel stated that he had no objection.

COURT: At this time, I am going to simply send them a note that says, "Keep deliberating." Is there objection to that?

GOVERNMENT.: United States has no objection.

DEFENSE: No objection, Your Honor. Tr. at 3. The court's instruction to "keep deliberating" was legally justified.

In *United States v. Kramer*, 955 F.2d 479, 489 (7th Cir.1992) the Seventh Circuit affirmed a conviction based on almost identical facts. In *Kramer*, the jury sent the judge a note stating that they were deadlocked eleven to one in favor of conviction, to which the judge responded with a note stating "Continue your deliberations. Judge Foreman." *Id.* at 489. The Seventh Circuit affirmed the convictions, stating that the district court's instruction was neutral and not coercive. *Id.* The *Kramer* court also found that the district judge's awareness of how the jury stood made no difference in its error assessment: "We are unable to see how that makes any difference; the instruction simply did not influence the jurors to find the appellants guilty or not guilty. Indeed, the holdout juror remained free to persuade the other

jurors to acquit the appellants." *Id.* The court finds this reasoning persuasive and finds no merit in the defendant's argument that the court's charge was coercive.

■ The defendant's argument that the court should have given an *Allen* charge to the jury is without merit. An *Allen* charge, based on the Supreme Court's decision in *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), is an "instruction advising deadlocked jurors to have deference to each other's views, that they should listen, with a disposition to be convinced, to each other's argument." *United States v. Seeright,* 978 F.2d 842, 845 n. * (4th Cir.1992) (quoting Black's Law Dictionary 74 (6th ed.1990)). The purpose of the *Allen* charge is to advise the jury (1) that a new trial would be costly; (2) that there is no reason to believe that a different jury could perform better; (3) that a unanimous verdict is important; and (4) that jurors in the minority should consider, without surrendering their convictions, whether the majority's position might be correct. *United States v. Russell,* 971 F.2d 1098, 1107 (4th Cir.1992).

Generally, an *Allen* charge is given by the court when the jury has reached an impasse in its deliberations and is unable to reach a consensus. *United States v. Burgos,* 55 F.3d 933, 935–36 (4th Cir.1995). The decision of whether to give an *Allen* charge is within the discretion of the trial court. *See United States v. Cropp,* 127 F.3d 354, 359–60 (4th Cir.1997); *Seeright,* 978 F.2d at 850.

Here, at the time of a colloquy addressing the jury's note, defense counsel objected to a mere suggestion by the Government that the court could consider an *Allen* charge:

> DC: Seems to me, Your honor, that we have one juror that has indicated that, well, has stated that they're [sic] not going to change. And a

charge, a subsequent charge would be perhaps coercive in nature when you do have one juror who says that they're [sic] absolutely, or they're [sic] dead set on being not guilty ... We would oppose a subsequent charge.

Tr. at 2. Because the defendant objected to the use of an *Allen* charge at trial, he cannot now complain of the court's failure to give that *Allen* charge. In any event, an *Allen* charge was unnecessary in this case. The court **FINDS** no error in its instruction to the jury to "keep deliberating" or in its failure to give an *Allen* charge.

For the reasons stated above, the defendant's Motion for Judgment of Acquittal and/or for New Trial is **DENIED.**

The court **DIRECTS** the Clerk to send a copy of this Order to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal, and **DIRECTS** the Clerk to post this published opinion at *http://www.wvsd.uscourts.gov.*